# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re | Chapter 7 |
| WORLEY & OBETZ, INC., *et al.*[1] | Case No. 18-13774 (MDC) |
| Debtors. | (Jointly Administered) |
| AMY DAVELER and MARCO PEREZ on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | Adversary No. 18-00132 (MDC) |
| WORLEY & OBETZ, INC., AMERIGREEN ENERGY, INC., and AMERIGREEN PROPANE, LLC, | (Jointly Administered) |
| Defendants. | |
| CHRISTINE C. SHUBERT, *Chapter 7 Trustee for the estates of Worley & Obetz, Inc., Amerigreen Energy, Inc., and Amerigreen Propane, LLC* | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Worley & Obetz, Inc. (6576) (Case No. 18-13774-REF); (ii) Americomfort, Inc. (7605) (Case No. 18-13775-REF); (iii) RPHAC, Inc. (9625) (Case No. 18-13776-REF); (iv) Amerigreen Energy, Inc. (6284) (Case No. 18-13777-REF); (v) Advance Air, Inc. (8111) (Case No. 18-13778-REF); (vi) Amerigreen Energy Brokers, LLC (2358) (Case No. 18-13779-REF); (vii) Amerigreen Electricity, LLC (8977) (Case No. 18-13780-REF); (viii) Amerigreen Hedging Services, LLC (8549) (Case No. 18-13781-REF); (ix) Amerigreen Lubricants, LLC (7489) (Case No. 18-13782-REF); (x) Amerigreen Natural Gas, LLC (3222) (Case No. 18-13783-REF); and (xi) Amerigreen Propane, LLC (Case No. 18-13784-REF).

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     RELEVANT FACTUAL BACKGROUND....................................................................... 2

III.    LEGAL STANDARDS .................................................................................................... 2

      A.      Legal Standard For Summary Judgment.................................................................. 2

      B.      The WARN Act's Basic Principles and Exceptions ................................................ 3

IV.     ARGUMENT..................................................................................................................... 4

      A.      The abrupt termination of funding by Fulton Bank, which was related to the
            criminal fraud of the Debtors' former CEO, satisfies the unforeseeable
            business circumstances exemption to the WARN Act. ........................................... 4

      B.      This Court should find that any argument that notices were not issued on June
            4, 2018 does not raise a genuine issue of material fact that would preclude
            summary judgment................................................................................................ 10

      C.      Lyons' fraud is not imputed to the Company and cannot be used to defeat the
            unforeseeable business circumstances defense...................................................... 11

      D.      Regardless of the unforeseeable business circumstance exception, partial
            summary judgment should be granted in favor of Debtors for employees
            employed at locations with less than fifty employees. ......................................... 12

      E.      Amerigreen Propane is entitled to summary judgment because it had
            no employees. ...................................................................................................... 16

V.      CONCLUSION............................................................................................................... 17

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*In re AE Liquidation, Inc.*,
    866 F.3d 515 (3d Cir. 2017) .......................................................................................... 4, 5

*In re AFA Inv., Inc.*,
    No. 12-11127 MFW, 2012 WL 6544945 (Bankr. D. Del. Dec. 14, 2012) ........................................ 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................................ 2

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006) ............................................................................................ 2

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................................................ 2

*Fireman's Ins. Co. v. DuFresne*,
    676 F.3d 965 (3d Cir. 1982) ............................................................................................ 2

*Frymire v. Ampex Corp.*,
    61 F.3d 757 (10th Cir. 1995) ..................................................................................... 13, 14, 16

*Gorini v. AMP Inc.*,
    94 F. App'x 913 (3d Cir. 2004) ..................................................................................... 14, 16

*In re HMR Foods Holding, LP*,
    602 B.R. 855 (Bankr. D. Del. 2019) ................................................................................ 5

*Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*,
    173 F.3d 175 (3d Cir. 1999) ....................................................................................... 3, 4, 9

*Int'l Union, United Mine Workers v. Jim Walter Res., Inc.*,
    6 F.3d 722 (11th Cir. 1993) ....................................................................................... 13, 14, 16

*In re Jevic Holding Corp.*,
    496 B.R. 151 (Bankr. D. Del. 2013) ............................................................................ 4, 5

*Keating v. Pittston City*,
    643 F. App'x 219 (3d Cir. 2016) ................................................................................ 10, 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................................. 10

*Meadows v. Latshaw Drilling Co., L.L.C.*,
    866 F.3d 307 (5th Cir. 2017) ..................................................................................... 12, 15

*Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v.*
  *PriceWaterhouseCoopers, LLP*,
    989 A.2d 313 (Pa. 2010).............................................................................................. 11

*Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
    267 F.3d 340 (3d Cir. 2001) ......................................................................................... 11

*Roquet v. Arthur Andersen LLP*,
    398 F.3d 585 (7th Cir. 2005) ....................................................................................... 4, 6

*In re Tama Mfg. Co., Inc.*,
    436 B.R. 763 (Bankr. E.D. Pa. 2010) ........................................................................... 4

*Thabault v. Chait*,
    541 F.3d 512 (3d Cir. 2008) ......................................................................................... 11

*Wishkin v. Potter*,
    476 F.3d 180 (3d Cir. 2007) ........................................................................................... 2

**Statutes**

29 U.S.C. 2101(a)(1).......................................................................................................... 16

29 U.S.C. § 2101(a)(2)........................................................................................... 3, 12, 15, 17

29 U.S.C. § 2102(b) ............................................................................................................. 3

29 U.S.C. § 2102(b)(2)(A) .................................................................................................. 4

Worker Adjustment and Retraining Act ("WARN Act") ...................................................*passim*

**Other Authorities**

29 C.F.R. § 639.3(i)(1).................................................................................................... 3, 12

29 C.F.R. § 639.3(i)(3)............................................................................................. 13, 14, 16

29 C.F.R. § 639.3(i)(4).................................................................................................. 12, 13

Fed. R. Bankr. P. 7056 ........................................................................................................ 2

Fed. R. Civ. P. 56(a) ........................................................................................................... 2

Fed. R. Civ. P. 56(c) ........................................................................................................... 2

Defendants, Christine C. Shubert (the "<u>Trustee</u>"), the Chapter 7 Trustee for the estates of

Worley & Obetz, Inc. ("<u>Worley</u>"), Amerigreen Energy, Inc. ("<u>Amerigreen Energy</u>"), and

Amerigreen Propane, LLC ("<u>Amerigreen Propane</u>", and together with Worley and Amerigreen

Energy, "<u>Debtors</u>"), through their undersigned counsel, Fox Rothschild LLP, file this

memorandum of law in support of their motion for partial summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure, Rule 7056 of the Federal Rules of Bankruptcy Procedure,

and Local Rule 7005-1(b).  For the reasons below, Debtors seek partial summary judgment in their

favor and against the certified class of plaintiffs (the "<u>Class</u>").

## I.     INTRODUCTION

This case involves an abrupt and unexpected closure of several related businesses in

Lancaster County.  The Debtors suddenly shutdown on June 4, 2018 as a result of criminal fraud

perpetrated by Jeffrey Lyons, Worley's former chief executive officer,  that caused Fulton Bank

("<u>Fulton</u>") to abruptly and unexpectedly terminate its banking and lending relationship with the

Debtors.  While Lyons and his criminal co-conspirators have been sentenced in their criminal

matters, the Class unjustifiably targeted the Debtors in this WARN Act case.  Under the unique

circumstances of this case, the Debtors are excused from giving the 60-day notice of a business

closure required by the WARN Act because the facts perfectly meet the statutory exception for

"unforeseen business circumstances."  Many former employees received a timely WARN Act

notice following the abrupt closure of their employer under circumstances that meet this notice

exemption.  Accordingly, these former employees are not entitled to damages under the WARN

Act.

In addition to the unforeseen business circumstances defense, there are some former

employees who were not covered by the WARN Act at the time of the closure.  These employees

were not employed at the type of facility covered by the WARN Act (a "single site of employment"

that experienced a layoff of fifty or more employees).  On this basis alone, these employees are

not entitled to damages under the WARN Act.

The Debtors make this *partial* summary judgment motion because there were some former

employees that did not receive a WARN Act notice.  These employees include those who were

employed at a covered WARN Act site and who did not receive a notice of their layoffs.  While

Debtors do not dispute that these employees are entitled to relief, the universe of aggrieved

employees under the WARN Act is narrower (only 21 employees) than is asserted by the Class.

## II.      RELEVANT FACTUAL BACKGROUND

Debtors incorporate by reference the Statement of Undisputed Material Facts ("SUMF")

which has been contemporaneously filed.

## III.     LEGAL STANDARDS

### A.      Legal Standard For Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*see also* Fed. R. Bankr. P. 7056.  A factual dispute is material when "it might affect the outcome

of the suit under the governing law," and genuine when "the evidence is such that a reasonable

jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). The moving party bears the initial burden of informing the court of the basis for

the motion and identifying those portions of the record that demonstrate the absence of a genuine

issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

To defeat summary judgment, the party opposing the motion cannot "rely merely upon

bare assertions, conclusory allegations or suspicions" to support its claim, *Fireman's Ins. Co. v.

DuFresne*, 676 F.3d 965, 969 (3d Cir. 1982), but must go beyond the pleadings and present specific

facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c).  *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.")  In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). *See also Celotex*, 477 U.S. at 322 (same).

### B.    The WARN Act's Basic Principles and Exceptions

The Worker Adjustment and Retraining Notification Act (the "WARN Act") requires certain employers to provide employees sixty (60) days' notice of a plant closing or other mass layoff of employees.  29 U.S.C. 2102(a).  "The thrust of WARN is to give fair warning in advance of prospective plant closings."  *Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999)

The WARN Act's coverage is limited in the type of facilities subject to the law.  In this regard, the WARN Act defines "plant closing" as the shutdown of an employer's "single site of employment" that results in the layoff of fifty (50) or more employees.  29 U.S.C. § 2101(a)(2). The term "single site of employment" is defined in regulations as "either a single location or a group of contiguous locations." 29 C.F.R. § 639.3(i)(1).  Thus, by limiting the definition of "plant closing" to only apply to "single site[s] of employment," the scope of the WARN Act is limited to situations when large groups of employees (fifty or more) are laid off in a specific place.  *Id.*

The WARN Act's notice requirement is subject to several exemptions that can reduce the 60-day notice period.  29 U.S.C. § 2102(b).  If any exemption applies, the employer still must provide to employees "as much notice as is practicable."  *Id.* § 2102(b)(3).  Under the unforeseeable business circumstance exemption, an employer need not provide 60-days' notice of

a plant closing if "the closing … is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." *In re Tama Mfg. Co., Inc.*, 436 B.R. 763, 769 (Bankr. E.D. Pa. 2010) (quoting 20 C.F.R. § 639.9(b)(1)).

## IV.    ARGUMENT

### A.    The abrupt termination of funding by Fulton Bank, which was related to the criminal fraud of the Debtors' former CEO, satisfies the unforeseeable business circumstances exemption to the WARN Act.

The unforeseeable business circumstance exemption applies to business closings that are not reasonably foreseeable.  When this exception is invoked by an employer, courts look to "whether a similarly situated employer in the exercise of commercially reasonable business judgment would have foreseen closing." *Hotel Emps. & Rest. Emps. Int'l Union Loc. 54*, 173 F.3d at 186 (citing 20 C.F.R. § 639.9(b)(2)) (quotations omitted); *see also Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 588 (7th Cir. 2005) [hereinafter, "*Arthur Andersen*"] ("[A] company will not be liable [under the WARN Act] if, when confronted with potentially devastating occurrences, it reacts the same way that other reasonable employers within its own market would react.").

The time at which a closing becomes "reasonably foreseeable" is when the closing is "probable" to occur. *In re AE Liquidation, Inc.*, 866 F.3d 515, 530 (3d Cir. 2017) ("[T]he WARN Act is triggered when a [plant closing] becomes probable—that is, when the objective facts reflect that the layoff was more likely than not.").  Under this framework, an employer need not provide notice to employees any time that it is merely possible that business circumstances might lead to a plant closing. *Id.; see also In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013).

There are important policy reasons that support the "probability" standard.  *In re Jevic Holding Corp.*, 496 B.R. at 163 (finding that requiring notices if closure is only a possibility "would run counter to the WARN Act's policy of encouraging employers to take all reasonable actions to preserve the company and the jobs[.]")  Premature notice of a plant closing or a mass layoff could "accelerate a company's demise and necessitate layoffs that otherwise may have been avoided."  *In re AE Liquidation, Inc.*, 866 F.3d at 530.  On this point, a premature notice may actually lead employees to voluntarily quit before a layoff, which could lead to a shutdown would not have otherwise occurred.  *Id.*  Thus, the exception for unforeseeable business circumstances seeks to balance the goal of the statute to provide notice to employees of an impending layoff and the ability of employers to maintain their businesses during periods of business turbulence.  *Id.*

These policy reasons are even more important in cases involving bankruptcy.  *See In re HMR Foods Holding, LP*, 602 B.R. 855, 867 (Bankr. D. Del. 2019) ("In the context of an impending bankruptcy, a WARN Act notice may hasten the collapse of the business by undermining management's best efforts to salvage it.").  The court in *HMR* explained how "bankruptcy . . . can muddle a WARN Act analysis," as follows:

> The typical WARN Act case arises when a company decides for cost-saving or unionization reasons to close a plant and move its operations elsewhere. In those instances, the employer is aware of the impending move well before it occurs and is in a position to either give employees the required notice, or if it chooses otherwise, to pay the sixty days of a worker's lost wages and benefits. Bankruptcy is the atypical case. In the context of an impending bankruptcy, a WARN Act notice may hasten the collapse of the business by undermining management's best efforts to salvage it.

*Id.* (quotations omitted).

Based on these general principles, courts, including a bankruptcy court in the Third Circuit, have found that the abrupt refusal of a bank or other lender to continue funding a business constitutes an unforeseeable business circumstance.  *See In re Jevic Holding Corp.*, 496 B.R. at

163 (finding, on a motion for summary judgment, that a bank's refusal to provide continued funding met the exception).

In addition, criminal actions that lead to potential WARN Act situations do not alter the general structure of the unforeseeable business circumstances exception. In *Arthur Andersen*, the court considered the accounting firm's closure following an indictment related to the Enron scandal. *Arthur Andersen LLP*, 398 F.3d at 588-589. The court found that, even though there was underlying criminal conduct, the layoffs did not become probable until the indictment was actually issued by the U.S. Attorney and caused clients to flee the firm. *Id.* Therefore, even where underlying criminal conduct is involved, that conduct itself does not make the layoffs probable, even if the criminal conduct was known to the employer before layoffs. *Id.* ("[W]hile it is true that the illegal acts of some Andersen employees were the root cause of the firm's ultimate downfall, not until the indictment became public did it feel the pain.").

Here, the sudden cessation of continued funding from Fulton on June 4, 2018 satisfies the unforeseeable business circumstances defense. This unexpected termination of the banking relationship between Fulton and the Debtors[2] was directly linked to the criminal fraud perpetrated by Jeffrey Lyons, the former CEO. Lyons committed criminal fraud by inflating accounts receivable and falsifying at least one contract with a customer to improperly enlarge receivables. SUMF ¶¶ 20-21. This fraud was unknown until May 15, 2018. SUMF ¶¶ 22-23.

Following the discovery of the fraud, the Debtors took several actions to address the consequences and attempt to preserve the businesses as a going concern, including, but not limited to, the following:

---

[2]    As noted in the accompanying Statement of Undisputed Material Facts, Worley and Amerigreen were related and affiliated entities. Accordingly, both companies, including their subsidiaries will be referred to as the "Debtors" in this memorandum of Law. Each company will be referred to separately where it is relevant.

1.      A meeting took place with Fulton Bank (the Debtors' main lender) on May 21, 2018, during which the representatives of the Debtors and Fulton discussed the future of the Debtors.  SUMF ¶¶ 24-25.

2.      Fulton did not immediately indicate that it would terminate its banking and lending relationship with the Debtors.  SUMF ¶ 25.

3.      Fulton agreed to stop its "sweep" of accounts from the Debtors on a nightly basis, meaning that accounts receivable would be kept by the Debtors as cash.  SUMF ¶ 29.

4.      The Debtors reviewed the state of the business, finances, and strategy to continue the businesses or sell/shutdown the entities.  SUMF ¶ 26.

5.      In evaluating the status of the businesses, the goal, according to Debtors' CFO Joel Hagaman, was to "keep the company going as best as possible and to survive."  SUMF ¶ 27.

6.      The Debtors considered selling or shutting down segments of the businesses.  SUMF ¶¶ 33-35.

7.      The Debtors considered liquidating all entities on an immediate or piecemeal basis.  SUMF ¶ 36.

8.      The Debtors considered creating a new entity to purchase some of the profitable business segments from the existing entities.  SUMF ¶¶ 37.

9.      The Debtors considered selling business segments to at least one possible buyer.  SUMF ¶ 38.

10.     The Debtors postponed payments due and owing to vendors to preserve cash.  SUMF ¶ 39.

11.     In addition to formulating plans to attempt to salvage the businesses, the Debtors

laid off and terminated thirty-four employees on or around May 21, 2018 as a cost saving

measure.[3]  SUMF ¶ 40.

After reviewing the status of the business, Hagaman believed that the Debtors could survive

through at least the summer of 2018.  SUMF ¶ 30.  He also believed that the Debtors could continue

in business as long as there was some form of debt restructuring.  SUMF ¶¶ 31-32.

Without advanced warning or specific notice,[4] Fulton terminated its banking and lending

relationship with the Debtors and seized their funds on June 4, 2018.  SUMF ¶ 48.  The Debtors

ceased operations on that date and terminated all employees.  SUMF ¶ 49.  The employees were

issued WARN Act notices on June 4, 2018.  SUMF ¶ 53.  In addition, WARN Act notices were

issued to the Commonwealth of Pennsylvania and Lancaster County.  SUMF ¶ 54.

While in hindsight it may appear that Fulton's termination of the banking/lending

relationship should have been anticipated because of Lyons' fraud, the *possibility* that Fulton

would seize the funds is irrelevant for determining whether the unforeseen business circumstances

test has been met.  Under the WARN Act, employee layoffs must be probable—more likely than

not – so as to justify the drastic step of providing notices to employees of impending terminations.

Lyons may have fraudulently inflated accounts receivable, but it was unknown before May 15,

---

[3]     Employees who were terminated on or around May 21, 2018 did not receive WARN Act notices.  *See* SUMF
¶ 42.  The Debtors do not dispute the claims related to these employees to the extent that they did not report to work
at the Manheim Pike facility, *see infra* Section IV.D (describing why the employee terminations at Manheim Pike
facility did not trigger the WARN Act).  For this reason, this motion for summary judgment is partial in nature.

While thirty-four (34) employees were terminated on May 21, 2018, *see* SUMF ¶ 40, only twenty-one (21)
employees were covered by the WARN Act.  *See* SUMF Ex. C, Declaration of Joel Hagaman, Exhibit.  Thirteen (13)
of the thirty-four employees terminated on May 21, 2018 worked at the Manheim Pike Facility and are excluded from
coverage of the WARN Act for the reasons described in Section IV.D, *infra*.  *See* SUMF Ex. C, Declaration of Joel
Hagaman, Exhibit 1 (roster of employees with termination dates).

[4]     Fulton issued a notice of default on May 29, 2018 which generally reserved its legal rights, but did not
specifically notify the Debtors that it would cease its banking/lending relationship.  SUMF ¶ 39.

2018 and did not immediately lead to Fulton's termination after it was discovered.  The Debtors

worked closely with Fulton and considered various options to try to continue the businesses.  *See*,

*supra*.  In essence, the Debtors acted like a reasonable business under the circumstances to evaluate

the options available to attempt to continue as a going concern.  *Hotel Emps. & Rest. Emps. Int'l*

*Union Loc. 54*, 173 F.3d at 186 (applying reasonableness standard when reacting to possibly

devastating business developments).

Indeed, it would be unreasonable for the Debtors to automatically assume that Fulton

would terminate its relationship upon first learning of Lyons' fraud and then notify affected

employees on possible employment terminations based on that assumption.  The *possibility* of

Fulton's termination does not necessarily mean that it was *probable* that Fulton would take such

an action.  Once it became clear that Fulton had severed the relationship, the Debtors swiftly

terminated the affected employees on June 4, 2018 and issued WARN Act notices.  Before June

4, 2018, there was no specific notice or indication that Fulton was going to completely terminate

its banking/lending relationship with the Debtors, and the Debtors should not be held to a higher

standard than what is required under the WARN Act based merely on the possibility that Fulton

might do so.

For these reasons, the Court should find that the termination of the banking/lending

relationship by Fulton, as a result of Lyons' fraud against the Debtors, was an unforeseen business

circumstance.  The Debtors are therefore entitled to reduce the WARN Act notice period to as

much notice as practicable.  The Debtors complied with this requirement by issuing notices on

June 4, 2018 to affected employees.  Thus, the Court should grant summary judgment in its favor

with respect to all employee terminations on June 4, 2018.

**B.    This Court should find that any argument that notices were not issued on June 4, 2018 does not raise a genuine issue of material fact that would preclude summary judgment.**

To preclude summary judgment, disputes of fact must be material and genuine. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (finding that a "metaphysical doubt as to the material facts" is not a genuine dispute).  "A lack of memory does not create a genuine dispute because an answer such as 'I don't recall' is insufficient evidence to rebut affirmative testimony or at least create 'fair doubt.'"  *Keating v. Pittston City*, 643 F. App'x 219, 224–25 (3d Cir. 2016) (citing *Lexington Ins. Co. v. W. Pa. Hosp.,* 423 F.3d 318, 333 (3d Cir. 2005); *Jersey Cent. Power & Light Co. v. Lacey Tp.,* 772 F.2d 1103, 1109 (3d Cir. 1985)).

To the extent that Michele Goodin testified in her deposition that she had no memory of drafting or actually mailing WARN Act notices, *see* SUMF ¶¶ 58-59, this testimony does not create a genuine dispute of material fact that would preclude summary judgment.  This is so for several reasons.  First, there is evidence in the record that Goodin and Becker did, in fact, issue the notices.  Becker admitted to working on a "mailing" to employees on June 4, 2018, including the specific recollection of stuffing letter in envelopes and placing postage on the envelopes.  SUMF ¶¶ 56-57.  In addition, Hagaman was present on June 4, 2018 and witnessed Goodin and Becker posting the notices.  SUMF ¶ 55.  Hagaman specifically recalled that the letters being mailed were WARN Act notices.  *Id.*

Second, Hagaman received two WARN Act notices in the mail in the days following June 4, 2018.  SUMF ¶ 61.  Moreover, Hagaman collected United States Postal Service return receipt cards in the mail that were returned to the Debtors after the closure.  SUMF ¶ 63.  Obviously, it is impossible to receive a return receipt card without actually mailing something to the recipient.  There is no other evidence in the record of any other "mailing" that would generate hundreds of Postal Service return cards, other than in connection with WARN Act notices being mailed on

June 4, 2012 to all terminated employees.  As such, there is sufficient evidence to preclude a genuine dispute of material fact that the notices were actually mailed.

Third, and finally, Goodin only testified that she did not recall mailing WARN Act notices—she did not testify that she failed to mail WARN Act notices.  SUMF ¶¶ 58-59 (noting that the closure was a traumatic event and that she lacked a memory of that time period).  Her lack of memory cannot create a *genuine* dispute of material fact where there is sufficient evidence to prove that the mailing actually occurred.  *Keating*, 643 F. App'x at 224–25.

### C.    Lyons' fraud is not imputed to the Company and cannot be used to defeat the unforeseeable business circumstances defense.

To the extent that the Class may argue that Lyons' fraud must be imputed to the company, and was therefore necessarily foreseeable, that argument should be rejected under the "adverse interest exception" to the law of imputation.  "Courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation."  *Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358 (3d Cir. 2001).  Under the adverse-interest exception, fraudulent conduct of a corporate officer is not imputed to the corporation if the "agent acts in his own interest, and to the corporation's detriment[.]"  *Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 333 (Pa. 2010) (on certification from the Third Circuit).  The adverse interest exception to the rule of imputation is satisfied where the fraudulent conduct at issue involves misrepresentations of corporate finances.  *Id.*  ("[W]e decline to consider a knowing, secretive, fraudulent misstatement of corporate financial information to be of benefit to a company.").  In addition, fraudulent conduct of a corporate officer is not imputed where the activity leads to insolvency.  *Thabault v. Chait*, 541 F.3d 512, 529 (3d Cir. 2008).

Accordingly, Lyons' fraudulent conduct, which involved secretive, fraudulent misstatements of corporate financial information, cannot be imputed to the Debtors. SUMF ¶¶ 20-21. In addition, this secretive conduct lead the Debtors toward insolvency and ultimately caused the closing of the Debtors. SUMF ¶¶ 42; 49. For these reasons, the general rules of imputation of corporate officer conduct do not apply to Lyons' fraud.

> **D.** **Regardless of the unforeseeable business circumstance exception, partial summary judgment should be granted in favor of Debtors for employees employed at locations with less than fifty employees.**

The WARN Act defines "plant closing" as the shutdown of an employer's "single site of employment" that results in the layoff of 50 or more employees. 29 U.S.C. § 2101(a)(2). Accordingly, the WARN Act is only triggered for employees who suffer an employment loss while working at an employment site with 50 or more employees.

A "single site of employment" is generally restricted to "either a single location or a group of contiguous locations." 29 C.F.R. § 639.3(i)(1). Non-contiguous sites will "rarely" be considered to be a single site of employment. *See Meadows v. Latshaw Drilling Co., L.L.C.*, 866 F.3d 307, 311 (5th Cir. 2017) ("[T]wo plants across town will rarely be considered a single site.") (quotations omitted); *see also In re AFA Inv., Inc.*, No. 12-11127 MFW, 2012 WL 6544945, at *6 (Bankr. D. Del. Dec. 14, 2012) (finding that plaintiffs "may not aggregate layoffs from several different sites of employment in order to meet the statutory minimum of 50 employees."). Department of Labor regulations state, "non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site." *Id.* § 639.3(i)(4). The regulations give the example that "assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers." 29 C.F.R. § 639.3(i)(4).

Therefore, it is not sufficient for two non-contiguous sites to be operated by the same employer or operated by two separate entities which qualify as a "single employer."  29 C.F.R. § 639.3(i)(4).  For separate locations to be considered a "single site of employment," they must meet a three-part test, which includes the following requirements:

(1) the separate facilities are in the same reasonable geographic proximity,

(2) the separate facilities are used for the same purpose, <u>and</u>

(3) the separate facilities share the same staff and equipment.

*Id.* § 639.3(i)(3) (emphasis added).  As an example of a non-contiguous site sufficiently integrated to constitute a "single site of employment," the regulations describe an employer who manages a number of warehouses in an area that regularly shifts or rotates the same employees from one building to another.  *Id.*  Under this example, the sites, which are close geographically, share the same purpose while using the same employees to advance the business.  *Id.*

Under this rubric, courts have refused to consider separate facilities as a "single site of employment," even where the purported site(s) where physically connected or geographically close.  In this regard, one court found that underground mines where not a "single site of employment even though the mines were, in part, physically connected and were operated by centralized upper management which exercised common control over labor relations.  *See Int'l Union, United Mine Workers v. Jim Walter Res., Inc.*, 6 F.3d 722, 725 (11th Cir. 1993).  In another case, a court found that facilities that were geographically close, and shared employees, were not a "single site of employment" because the facilities engaged in two different business segments, even though the businesses were similar.  *Frymire v. Ampex Corp.*, 61 F.3d 757, 767 (10th Cir. 1995) (involving one facility that produced audio-visual equipment and the other produced special effects and editing equipment).

13

Decisions like *Mine Workers* and *Frymire* highlight the conjunctive nature of the three-part DOL test described above. *See* 29 C.F.R. § 639.3(i)(3). Failure to meet even one aspect of the test dooms a finding of non-contiguous sites being considered a "single site of employment." *Id.* Thus, in *Mine Workers*, the facilities were separate sites because they did not share employees, even though they were close geographically (even connected underground) and served the same purpose (mining). *Int'l Union, United Mine Workers*, 6 F.3d at 725. In addition, in *Frymire*, the facilities were separate sites because they did not share the same business purpose, even though they were close geographically and shared employees. *Frymire*, 61 F.3d at 767. Of note, in reaching the determination that the businesses in *Frymire* did not serve the same business purpose, the court distinguished between two types of entertainment equipment – audio/visual equipment and special effects / editing equipment. *Id.* Being in the same general industry is not enough to find the same business purpose. *Id.*

Courts that have found non-contiguous sites to be a "single site of employment" have only done so where all three elements are satisfied. *See Gorini v. AMP Inc.*, 94 F. App'x 913, 920 (3d Cir. 2004). In that case, the court found a group of facilities in the same geographic area, which were known as a "campus" and shared street boundaries with each other, were a single site of employment because employees and operations were shared between the buildings. *Id.*

In addition, the three-part DOL test is the only relevant test for determining that non-contiguous sites constitute a "single site of employment." Courts have rejected the relevancy of alleged single employer status of separate legal entities in connection with this question. As an example, the court in *Mine Workers* expressly rejected the argument that common ownership and common upper management compelled a finding of a single site of employment. *Int'l Union,*

14

*United Mine Workers*, 6 F.3d at 725 (noting the "Union's attempt to blur the distinction between a single site and a single employer [was] unsuccessful.").

Amerigreen Energy employees were not employed at a "single site of employment" that suffered employment losses of fifty or more employees. Amerigreen Energy maintained a facility at 1650 Manheim Pike, Suite 201, Lancaster, PA 17601 (the "Manheim Pike Facility"). SUMF ¶ 7. Approximately thirty-three (and at no time fifty or more) Amerigreen employees regularly reported for work at the at the Manheim Pike Facility. SUMF ¶¶ 8-9. The employment losses of thirty-three employees at a facility are not sufficient to trigger the WARN Act. 29 U.S.C. § 2101(a)(2). As such, the employees who were employed at the Manheim Pike Facility prior to their employment loss are not affected employees under the WARN Act. Summary judgment should be entered in favor of the Debtors with regard to these employees to the extent that summary judgment is not entered on the grounds of the unforeseeable business circumstance defense, as set forth above.

To the extent that it is argued that the Debtors' various work locations should be combined to meet the threshold requirements of a "single site of employment," that assertion should be rejected for three reasons, which correspond to the DOL factors described above. First, the work locations are not in the same reasonable geographic location. Becker testified that the Worley facility at 85 White Oak Road in Manheim was approximately fifteen minutes away by car from the Manheim Pike Facility operated by Amerigreen Energy. SUMF ¶ 10. Per the addresses, the facilities were located in different municipalities. Therefore, while the DOL has opined in regulations that facilities "across town" could be considered to be a "single site of employment," these facilities fall beyond that municipal and general geographical dividing line. *See Meadows*, 866 F.3d at 311 ("[T]wo plants across town will rarely be considered a single site."); *see also*

*Gorini*, 94 F. App'x at 920 (finding facilities in close proximity because the buildings shared common street boundaries).

Second, there is insufficient record evidence of any substantial sharing of employees between locations, including the White Oak Road facility and the Manheim Pike Facility. Failure to meet this element dooms the claim for "single site" status even if the facilities were deemed to be in the same geographic area. *Int'l Union, United Mine Workers*, 6 F.3d at 725.

Third, Worley and AmeriGeen engaged in different business purposes. While Worley and Amerigreen Energy were broadly engaged in the energy industry, they concentrated on different products and services. Worley provided various products and services for clients and customers, including home heating oil, propane, and natural gas for commercial and residential clients, as well as heating ventilation and air-conditioning services. SUMF ¶ 1. By contrast, Amerigreen Energy was a wholesale distributor of fuel. SUMF ¶ 6. Therefore, any employees who may have been shared between the Worley and Amerigreen facilities were not engaged in the same activities for the operational purpose. Accordingly, the facilities cannot be considered a single site of employment. 29 C.F.R. § 639.3(i)(3); *Frymire*, 61 F.3d at 767.

> **E.**    **Amerigreen Propane is entitled to summary judgment because it had no employees.**

The WARN Act only applies to employers with 100 or more employees. 29 U.S.C. 2101(a)(1). Amerigreen Propane did not have *any* employees around the time of the closure of the Debtors. SUMF ¶ 5. Therefore, is not an "employer" under the WARN Act. As such, summary judgment should be granted in its favor.

## V.    CONCLUSION

Based on the foregoing, this Court should enter partial summary judgment in favor of the

Debtors as to all Debtors' employees except for employees who were employed by Defendant

Worley & Obetz, Inc. who were terminated on or around May 21, 2018.[5]

Respectfully submitted,

*/s/ Andrew M. MacDonald*
Steven K. Ludwig, Esquire
Andrew MacDonald, Esquire
Jesse M. Harris, Esquire
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, PA  19103-3222
(215) 444-7174 / (215) 299-2150 (fax)
SLudwig@FoxRothschild.com
AMacDonald@FoxRothschild.com
Jesseharris@foxrothschild.com

*Attorneys for Christine C. Shubert,*
*Chapter 7 Trustee*

Dated:  May 14, 2021

---

[5]    Thirty-four employees were terminated on May 21, 2018, but did not receive the required notices pursuant to the WARN Act.  *See* SUMF ¶¶ 40-41.   The thirty-four employees were employed by either Worley or Amerigreen Energy.  *See* SUMF ¶ 40 (referencing Exhibit 3 attached to Ex. C, Declaration of Joel Hagaman, which is a roster of employees with termination dates).  Of these thirty-four employees, the thirteen employees who were employed by Amerigreen Energy were not covered by the WARN Act because they were employed at a single site of employment with less than fifty employees at the time of the terminations.  29 U.S.C. § 2101(a)(2).   Therefore, twenty-one employees of Worley who were terminated on or around May 21, 2018 are excluded from this motion for partial summary judgment.