**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| Worley & Obetz, *et al.*, | : | |
| | : | |
| Debtors. | : | Bankruptcy No. 18-13774-MDC |
| | : | |
| Amy Daveler and Marco Perez, on behalf of themselves and all others similarly situated, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Adversary No. 18-00132-MDC |
| Worley & Obetz, Inc., Amerigreen Energy, Inc., and Amerigreen Propane, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| Christine C. Shubert, Chapter 7 Trustee for the Estates of Worley & Obetz, Inc., Amerigreen Energy, Inc., and Amerigreen Propane, LLC | : | |
| | : | |

# MEMORANDUM

## I.    INTRODUCTION

Plaintiffs, Amy Daveler and Marco Perez (the "Plaintiffs"), have filed a class action adversary proceeding (the "Adversary Proceeding") against debtors Worley & Obetz, Inc. ("Worley"), Amerigreen Energy, Inc. ("Amerigreen Energy"), and Amerigreen Propane, LLC ("Amerigreen Propane," and together with Worley and Amerigreen Energy, the "Defendants" and together with the Plaintiffs, the "Parties").[1]  The Plaintiffs, on behalf of themselves and other

---

[1] The Defendants each filed voluntary bankruptcy petitions under chapter 7 of the United States

similarly situated former employees of the Defendants, allege the Defendants violated the

Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§2101, *et seq.* (the "WARN

Act") when ceasing operations and terminating their former employees in 2018.

Pending in the Adversary Proceeding are (i) the Defendants' Motion for Partial Summary

Judgment (the "Defendants' Summary Judgment Motion"),[2] and (ii) the Plaintiffs' Motion for

Partial Summary Judgment (the "Plaintiffs' Summary Judgment Motion," and together with the

Defendants' Summary Judgment Motion, the "Summary Judgment Motions").[3]  For the reasons

set forth herein, the Court will (a) grant the Plaintiffs' Summary Judgment Motion, and (b) deny

the Defendants' Summary Judgment Motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[4]

### A.      The Defendants' Business and Closure

Worley was in the business of commercial and residential energy services, as well as

heating, ventilation, and air conditioning services.  Jeffrey Lyons ("Mr. Lyons") was the CEO of

Worley, and Joel Hagaman ("Mr. Hagaman") was the Chief Financial Officer.  Seth Obetz ("Mr.

Obetz") was an owner of Worley and also held a senior management role.  Worley maintained its

corporate headquarters at 85 White Oak Road in Manheim, Pennsylvania (the "Worley Manheim

---

Bankruptcy Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code") on June 6, 2018 (the "Petition
Date").  Christine Shubert (the "Trustee") was appointed as the chapter 7 trustee for each Defendant's
estate on the same day.  One day later, the Plaintiffs filed the Complaint (the "Complaint") initiating
the Adversary Proceeding.  Adv. Pro. Docket No. 1.  The Defendants therefore proceed in the Adversary
Proceeding through the Trustee.

[2] Bankr. Docket No. 90.

[3] Bankr. Docket No. 94.

[4] The factual background is only taken from admitted allegations of the Complaint and the undisputed
facts the Parties submitted in connection with the Summary Judgment Motions.  See Adv. Pro. Docket Nos. 6, 92,
98-1, 101.

Office"), and also maintained a facility on Greenfield Road in Lancaster, Pennsylvania (the

"Worley Lancaster Office").

Amerigreen Energy was an affiliate of Worley and was a wholesale distributor of

petroleum products.  Mr. Lyons held a senior management role with Amerigreen Energy, and

Mr. Hagaman was the Chief Financial Officer.  Mr. Obetz also held a senior management role

with Amerigreen Energy.  Defendant Amerigreen Propane, LLC ("Amerigreen Propane") was a

division of Amerigreen Energy until at least 2017.[5]  Amerigreen Energy maintained offices at

1650 Manheim Pike in Lancaster, Pennsylvania (the "Amerigreen Lancaster Office") and in New

Jersey.  Amerigreen Energy initially had operated out of the Worley Manheim Office, before

first moving to a location next door, then to the Amerigreen Lancaster Office.  Prior to the

Defendants' cessation of operations Mr. Obetz intended to recombine the Worley Manheim

Office and the Amerigreen Lancaster Office to eliminate the frequent travel between offices and

increase efficiencies managing employees in different locations.

Mr. Lyons is central to the Defendants' cessation of operations in 2018.  It is undisputed

that Mr. Lyons engaged in corporate fraud in his position as CEO of Worley.  Mr. Lyons,

together with two of Worley's controllers (together, the "Controllers"), falsified profit and loss

figures to inflate Worley's accounts receivable, thereby making Worley look more profitable

than it actually was.  Mr. Lyons would receive the actual profit and loss statements from most or

every Worley department, then add fictional profits.  Mr. Lyons also falsified a contract with

Giant Supermarkets ("Giant") to inflate the account receivable from Giant.  By 2018, Mr. Lyons

---

[5] The Plaintiffs dispute that Amerigreen Propane continued to be a division of Amerigreen Energy after
July 2017, at which time they assert it was "transferred to and fully absorbed by Worley."  See *Plaintiffs'
Response in Opposition to Defendants' Motion for Partial Summary Judgment,* Bankr. Docket No. 98-1,

had been falsely inflating revenue and accounts receivable for approximately 13 years.  Mr.

Lyons also worked with Amerigreen Energy's controller to fraudulently move cash between

Amerigreen Energy and Worley and concealed those transfers by making them appear to be

transactions from legitimate customers.

Mr. Lyons' fraudulent activity began to unravel, however, when, in 2017, Worley hired a

consulting firm named Strategic Resources, Inc. ("Strategic Resources") to help develop a

strategic plan.  Part of Strategic Resources' work entailed an assessment of Worley's unaudited

financial statements.  A Strategic Resources presentation in March 2018 indicated that Worley's

interest costs were evenly spread across Worley's various divisions, whereas Mr. Obetz's review

of financial documents had led him to believe interest costs were mostly attributable to the

wholesale division's ("Wholesale") business with Giant.  This inconsistency led Mr. Obetz to

conduct a further review of Worley's accounting of interest costs, which resulted in the

determination that Worley had lost $700,000 in 2017, whereas its financials had shown profits of

$1 million.  It was later learned that Mr. Lyons had fabricated sales of gasoline to Giant after

2014, when Giant stopped purchasing gasoline from Worley, and distributed the associated

interest costs across Worley's divisions, rather than house them with the Wholesale division.

Mr. Obetz confronted Mr. Lyons about Worley's interest costs and the Wholesale

division losing money and, in an effort to avoid necessary layoffs of Wholesale employees,

directed Mr. Lyons to set up a meeting with Giant to discuss either selling more gasoline to Giant

or charging more for it.  Mr. Lyons agreed to do so, but for weeks represented that he needed to

reschedule the meeting for personal reasons or that his contact at Giant was not responding.

---

at ¶4 ("Plaintiffs' Response Brief").

Ultimately Mr. Obetz reached out to Giant himself and scheduled a meeting for May 15, 2018. On that day, however, Mr. Lyons failed to attend the meeting and went missing.  Mr. Obetz returned to Worley's offices from the meeting and learned the details of Mr. Lyons' fraud from two Worley employees.[6]

Realizing that Fulton Bank ("Fulton"), the primary funder of the Defendants' operations, had lent tens of millions of dollars based in part on receivables from Giant that did not exist, Mr. Obetz met with bank representatives on May 16, 2018, to disclose Mr. Lyons' fraud.  The bank's representatives evidenced great concern and advised that they would need to consult Fulton's workout group, which Mr. Obetz understood to be Fulton's team for taking control of troubled companies.  Shortly after the May 16th meeting, Fulton terminated the Defendants' line of credit, ceased lending, and ceased its nightly "sweep" of the Defendants' accounts, leaving the Defendants' daily intake as their only access to cash.  The Defendants' senior management did not believe at that point that other financing sources would be available given the magnitude of the fraud, nor did they believe vendors would continue supplying them with propane and heating oil.

In the days following May 16th, the Defendants' management, including Mr. Obetz and Mr. Hagaman, attempted to validate the entities' actual financials, which when corrected to remove the fraudulent entries revealed an unprofitable business that had lost $2.5 million the prior year and would not make a profit in the upcoming year.  Moreover, without the Fulton line of credit, the enterprise was on track to run out of cash within a week and needed to reduce its

---

[6] Mr. Lyons was ultimately indicted for, among other things, bank fraud, and was sentenced to fourteen years in federal prison and ordered to pay restitution in the amount of $54,548,638.00 to Fulton and to the Internal Revenue Service.

expenses prior to May 25th in order to continue operations.  Management was therefore also

seeking to ascertain the status of the business, the state of its financing, and the viability of the

business moving forward, either in whole or in part.  Mr. Hagaman believed some form of

corporate reorganization or restructuring would be necessary, and management considered a host

of actions including selling the Wholesale business, liquidating the businesses, letting parts of

the business continue operations, and/or creating a "little Worley" that would consist of certain

parts of the Defendants' operations but would retain at most 34 employees.  Mr. Obetz also made

a proposal to Fulton to sell certain corporate vehicles to help support operations but did not

receive Fulton's permission to sell its collateral.

The Defendants' fate ultimately rested in the hands of Fulton.  The Defendants had no

ability to satisfy the $80 million debt to Fulton from operations or assets, and Fulton had the

option to liquidate the business to recoup what it could of the debt.  Representatives of the

Defendants met with Fulton on May 21, 2018, to discuss the Defendants' business and survival

options, but no solution emerged.  At no time did Fulton ask the Defendants to make a proposal

that would maintain operations as they were or suggest that it was interested in supporting the

Defendants' operations as they had been to that point.  Nor did any proposals to Fulton from

Defendants' management contemplate maintenance of the entire business with its full workforce.

Rather, Mr. Obetz wanted to take measures to discontinue parts of the Defendants' business to

remain viable in the short-term, including Wholesale, fleet fueling, the "WoGo" operation, and

Amerigreen Energy's natural gas division.  The Wholesale division was especially problematic

because the costs of fueling and insurance depleted significant cash, and although Mr. Obetz had

initial conversations with Giant regarding a purchase of the Wholesale division, Giant was not

interested.  In the meantime, a significant payment for Wholesale's state-issued license was coming due at the end of May, which Worley could not afford to pay, and without a sale all Wholesale employees would need to be terminated.  Ultimately the Defendants' management considered any part of the business potentially saleable but needed Fulton's permission to sell or liquidate.  Mr. Obetz sought that permission, but it was not given.  As a result, as of May 21, 2018, there were no plans in place to sell any business divisions, including Wholesale. Moreover, all of the Defendants' proposals to Fulton would have required additional credit from the bank.

The Defendants' demise swiftly followed the May 21st meeting with Fulton.  On or about that date, Worley and Amerigreen Energy laid off 34 employees (collectively, the "May 21st Laid Off Employees").  The May 21st Laid Off Employees did not receive notice of their terminations pursuant to WARN.  Even immediately after the layoffs, however, the Defendants' cash flow analysis showed its cash would be depleted by May 25th, and Hagaman was revising it many times each day to determine whether there was sufficient cash to meet daily expenses.  On May 25th, Giant cancelled its contract with Wholesale.  As of that date, cash was going to run out by May 29th.  On May 26th, Mr. Obetz ordered the termination of Wholesale's 72 employees, who were terminated on May 29th and advised that it was the result of the Giant contract being canceled.  By May 27th, the Defendants planned to shut down their commercial business lines. Also on May 29th, Fulton issued a notice of default to Worley, referencing both Mr. Lyons' fraudulent activity and the resulting material adverse change to Worley's financial condition.  A call between representatives of Fulton, other banks with an interest in loans made to the Defendants, and the Defendants' management, including Mr. Hagaman, followed on Saturday,

June 2nd.  Mr. Hagaman did not believe that Fulton was more likely than before to demand

liquidation of the Defendants' business, but while at a Fulton branch location on the next

business day, June 4th, he was told that the bank refused to issue a certified check.  Mr. Obetz

was subsequently advised that Fulton had swept the Defendants' accounts and was shutting them

down.  Once Fulton seized their remaining funds, the Defendants immediately ceased operations

and terminated all employees on June 4, 2018.[7]

### B.    The Bankruptcy Filing and the Adversary Proceeding

Two days after ceasing operations, on June 6, 2018, the Defendants, together with eight

affiliates, filed voluntary bankruptcy petitions under chapter 7 of the Bankruptcy Code.  The

Trustee was appointed on that date.  The following day, the Plaintiffs initiated the Adversary

Proceeding.

The Complaint alleges the Plaintiffs and approximately 250 other former employees of

the Defendants (the "WARN Class")[8] were terminated as part of a mass layoff ordered by the

Defendants on or about May 21, 2018, triggering the WARN Act's notice requirements.  The

Plaintiffs allege the Defendants failed to give the members of the WARN Class 60 days advance

notice of their terminations as required by the WARN Act, and failed to pay the members of the

WARN Class their respective wages, salary, commissions, bonuses, accrued vacation and

---

[7] Plaintiffs dispute this fact only in the sense that Mr. Hagaman continued to work for the Defendants as a consultant to the Trustee and continues to do so.

[8] On July 19, 2020, the Court entered a consent order pursuant to Federal Rule of Civil Procedure 23 and Federal Rule of Bankruptcy Procedure 7023 certifying the WARN Class as "Plaintiffs and all persons (i) who worked at or reported to one of the Defendants' Facilities, (ii) who were terminated from employment on or about May 21, 2018, within 30 days of that date, or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants on or about May 21, 2018, (iii) who are 'affected employees' within the meaning of 29 U.S.C. §2101(a)(5) and (iv) who have not filed a timely request to opt-out of the class."  *See* Adv. Pro. Docket No. 53.

personal time off for 60 days following their respective terminations, and failed to make the

pension and 401(k) contributions and provide employee benefits under COBRA for 60 days after

their respective terminations (the "WARN Act Damages").  With respect to monetary relief, the

Complaint seeks (a) an allowed priority wage claim up to $12,850 for each WARN Class

member pursuant to §§507(a)(4) and (a)(5) of the Bankruptcy Code, with the remainder of any

WARN Class member's claim being a general unsecured claim, or alternatively, a post-petition

administrative expense claim for each WARN Class member's WARN Act Damages, and (b)

reasonable attorneys' fees, costs, and disbursements, as authorized by the WARN Act.

The Defendants filed an Answer generally denying the allegations of the Complaint, after

which the Parties engaged in discovery.

### C.    The Summary Judgment Motions

#### 1.    The Defendants' Summary Judgment Motion

The Defendants' Summary Judgment Motion was filed on May 14, 2021.  The motion

seeks only partial summary judgment in favor of the Defendants because they acknowledge there

were 21 terminated former employees who did not receive a WARN Act notice as required,

entitling them to relief.  With respect to the balance of the WARN Class, however, the

Defendants offer several reasons summary judgment in their favor is warranted.

First, the Defendants argue that the "unforeseeable business circumstance" exemption to

the WARN Act's notice requirement applies to the circumstances of the Defendants' closure.

Under that exemption, the Defendants argue, an employer need not provide 60 days' notice of a

plant closing if the closing is caused by business circumstances that were not reasonably

foreseeable as of the time that notice would have been required.  *See Memorandum of Law in*

*Support of Defendants' Motion for Partial Summary Judgment*, Adv. Pro. Docket No. 91, at 4

("Defendants' Summary Judgment Brief") (citing §2102(b)(2)(A) of the WARN Act).  Instead,

such an employer is required only to provide terminated employees as much notice as is

practicable.  *Id.* at 3 (citing §2102(b)(3) of the WARN Act).  The Defendants argue that Fulton's

abrupt termination of funding on June 4, 2018, prompted by Mr. Lyons' criminal fraud,

constitutes unforeseeable business circumstances under the WARN Act.  On that date, the

Defendants assert, they satisfied the WARN Act's requirement by issuing WARN notices to all

terminated employees, and therefore should be granted summary judgment with respect to those

employees' claims.

Second, the Defendants preemptively argue that any assertion from the Plaintiffs that no

WARN Act notices were issued on June 4, 2018, does not raise a genuine issue of fact

precluding summary judgment.  Challenging the deposition testimony from Michele Goodin

("Ms. Goodin"), former Vice President of Human Resources and Shared Services for Worley,

that she did not recall drafting or mailing WARN Act notices, the Defendants point to contrary

testimony from Mr. Hagaman and Amber Becker ("Ms. Becker"), Worley's Human Resources

Manager.  The Defendants argue this constitutes sufficient evidence to preclude a genuine

dispute of material fact that WARN Act notices were actually mailed, particularly where Ms.

Goodin testified only that she did not recall mailing notices, rather than that they were not

mailed.

Third, the Defendants argue that the fraud of Mr. Lyons and the Controllers is not

imputed to the Defendants to defeat the unforeseeable business circumstances exception to the

WARN Act.  The Defendants cite the "adverse interest exception" to the law of imputation,

under which the fraudulent conduct of a corporate officer is not imputed to the corporation if the

agent acts in his own interest and to the corporation's detriment.  The Defendants also argue the

fraudulent conduct of a corporate officer is not imputed where the activity involves

misrepresentation of financial information or leads to insolvency.  Here, the Defendants assert,

Mr. Lyons' fraud was conducted in secret and resulted in their insolvency, and therefore cannot

be imputed to them.

Fourth, the Defendants argue that regardless of whether the unforeseeable business

circumstances exception applies, partial summary judgment in their favor is warranted with

respect to any WARN Class members who were employed at locations with less than 50

employees.  The WARN Act, the Defendants argue, applies to a "plant closing," defined to mean

the shutdown of a "single site of employment" resulting in the layoff of 50 or more employees.

Defendants' Summary Judgment Brief, at 12 (citing §2101(a)(2) of the WARN Act).  Citing the

three-part test for "single site of employment" found in applicable regulations, the Defendants

assert that non-contiguous sites are rarely considered a single site of employment, regardless of

whether they are operated by the same employer or by two separate entities which qualify as a

"single employer" under the regulations.  The Defendants argue that Amerigreen Energy

employees were not employed at a "single site of employment" because at no point were there 50

or more employees located at the Amerigreen Lancaster Office, and therefore WARN Act

notices were not required to be given to former employees at that office.  Tracking the

requirements of the applicable three-part test, the Defendants assert that there is no basis to

combine the Defendants' various offices to satisfy the single site of employment requirement

because the locations were not in the same reasonable geographic proximity, there is insufficient

record evidence that employees were shared between locations, and Worley and Amerigreen

Energy had different business purposes.

Finally, the Defendants argue complete summary judgment should be granted in favor of

Amerigreen Propane because it did not have any employees, and therefore was not an

"employer" under the WARN Act.

### 2.    The Plaintiffs' Summary Judgment Motion

The Plaintiffs' Summary Judgment Motion was filed on May 14, 2021, the same day as

the Defendants' motion.  The Plaintiffs do not seek summary judgment on the merits of their

WARN Act claims, but rather seek partial summary judgment only on the issue of whether the

Defendants, together with non-defendant affiliate Ranck Plumbing Heating & Air Conditioning,

Inc. ("Ranck," and together with the Defendants, the "Affiliated Entities"), together constituted a

single employer under the WARN Act, such that they are aggregated and are jointly and

severally liable for any WARN Act violations.  The Plaintiffs assert that, although on paper these

were separate corporations, they functioned inseparably as a unified enterprise under one family

business umbrella for WARN Act purpose.  *See* Adv. Pro. Docket No. 94-2, *Memorandum of*

*Law in Support of Plaintiff's Motion for Partial Summary Judgment* ("Plaintiffs' Summary

Judgment Brief") at 19.

The Plaintiffs point to the multi-factor guidance set forth in applicable Department of

Labor regulations (the "DOL Regulations"), applied by the Third Circuit to the WARN Act's

"single employer" doctrine in *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 478 (3d Cir.

2001).  Those factors are (i) common ownership, (ii) common directors and/or officers, (iii) de

facto exercise of control, (iv) unity of personnel policies emanating from a common source, and

(v) the dependency of operations.  Plaintiff's Summary Judgment Brief at 20.  The Plaintiffs

argue that consideration of these factors should result in a determination that there was an

absence of functional independence among the Affiliated Entities, resulting in one company,

albeit with three divisions or departments.  The Plaintiffs also argue that the absence of an arms-

length relationship between the Affiliated Entities supports a finding that they operated as a

single business enterprise without independence from each other.  According to the Plaintiffs,

there is no dispute of genuine material fact that Amerigreen Energy, Amerigreen Propane, and

Ranck were "functionally never more than divisions of Worley."  Plaintiffs Summary Judgment

Brief at 36.  The Plaintiffs therefore assert summary judgment in their favor is warranted on the

issue of whether the Affiliated Entities were a single employer under the WARN Act.

## III.    DISCUSSION

### A.    Standard for Summary Judgment

The standard for evaluating a motion for summary judgment is well-established:

> Summary judgment is appropriate only when, drawing all reasonable
> inferences in favor of the nonmoving party, there is no genuine issue as to
> any material fact and the moving party is entitled to judgment as a matter
> of law.  *E.g., Tri-M Group, LLC v. Sharp*, 638 F.3d 406, 415 (3d Cir.
> 2011); *In re Bath*, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010).  In other
> words, summary judgment may be entered if there are no disputed issues
> of material fact, and the undisputed facts would require a directed verdict
> in favor of the movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112,
> 1115 (11th Cir. 1993).

> In evaluating a motion for summary judgment, the court's role is not to
> weigh the evidence, but to determine whether there is a disputed, material
> fact for resolution at trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
> 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A genuine issue of
> material fact is one in which sufficient evidence exists that would permit a
> reasonable fact finder to return a verdict for the non-moving party.  *Id.* at
> 248.  In evaluating the record, the court must view the underlying facts
> and make all reasonable inferences therefrom in the light most favorable

> to the party opposing the motion. *Montone v. City of Jersey City*, 709 F.3d
> 181, 189 (3d Cir. 2013); *United States v. 717 South Woodward St.*, 2 F.3d
> 529, 533 (3d Cir. 1993). On the other hand, if it appears that the evidence
> "is so one-sided that one party must prevail as a matter of law," the court
> should enter judgment in that party's favor. *Anderson*, 477 U.S. at 252.

*Fraction v. Jacklily, LLC (In re Fraction)*, 622 B.R. 642, 646-647 (Bankr. E.D. Pa. 2020).

If the moving party bears the burden of proof were the matter to proceed to trial, the

movant must support its motion with credible evidence that would entitle it to a directed verdict

if not controverted at trial. *Lee v. 6209 Mkt. St., LLC (In re Lee),* 2022 Bankr. LEXIS 675, at *9

(Bankr. E.D. Pa. Mar. 15, 2022) (*quoting In re Polichuk*, 506 B.R. 405, 420-22 (Bankr. E.D. Pa.

2014)). The evidence must establish all essential elements of the movant's case, and if this

initial burden is met, the responding party must designate specific factual averments through the

use of affidavits or other permissible evidentiary material which demonstrate a genuine issue of

material fact to be resolved at trial. *Id.* When the non-moving party bears the burden at trial and

the movant meets its burden of directing the court to items demonstrating the absence of a

genuine issue of fact, the non-moving party must produce evidence sufficient to create a genuine

issue. *Davenport v. Medtronic, Inc.*, 302 F. Supp. 2d 419, 435 (E.D. Pa. 2004). That is, to

survive summary judgment, the nonmovant must "do more than simply show there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

### B.    Overview of the WARN Act and Applicable Regulations

Before addressing the competing Summary Judgment Motions, the Court first gives a

general overview of the WARN Act's provisions as they relate to this case. The WARN Act

provides that an employer shall not order a plant closing or mass layoff until the end of a 60-day

period after the employer provides written notice of such an order to each affected employee (or

their representative, if any) and to certain relevant State and local officials.  29 U.S.C. §2102(a).

The 60-day notice period may be reduced if one of certain enumerated exceptions apply,

however, including "if the plant closing or mass layoff is caused by business circumstances that

were not reasonably foreseeable as of the time that notice would have been required."  *Id.* at

§2102(b)(2)(A).  An employer relying on this exception to the 60-day notice period, however,

"shall give as much notice as is practicable and at that time shall give a brief statement of the

basis for reducing the notification period."  *Id.* at §2102(b)(3).  The WARN Act gives the

Secretary of Labor the authority to "prescribe such regulations as may be necessary to carry out"

the statute.  *Id.* at §2107(a).  An employer found in violation of the WARN Act is liable to each

aggrieved employee suffering an employment loss for back pay and back benefits, subject to

potential court-imposed reduction.  *Id.* at §2104(a).

    The Parties' competing arguments partially hinge on certain of the WARN Act's

definitions and the implementing DOL Regulations, 20 C.F.R. §§639.1 to 639.10.  The statute

defines an employer as "any business enterprise that employs – (A) 100 or more employees,

excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least

4,000 hours per week (exclusive of hours of overtime)."  *Id.* at §2101(a)(1).  The DOL

Regulations provide that "[u]nder existing legal rules, independent contractors and subsidiaries

which are wholly or partially owned by a parent company are treated as separate employers or as

a part of the parent or contracting company depending upon the degree of their independence

from the parent.  Some of the factors to be considered in making this determination are (i)

common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv)

unity of personnel policies emanating from a common source, and (v) dependency of operations." 20 C.F.R. §639.3(a)(2).

The term "plant closing" means "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding part-time employees." 29 U.S.C. §2101(a)(2). The DOL Regulations provide guidance as to what may or may not qualify as a single site of employment. 20 C.F.R. §639.3(i). That guidance provides, among other things, that (a) a single site of employment can refer to either a single location or a group of contiguous locations, (b) there can be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building, (c) separate buildings or areas may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment, but to the extent non-contiguous sites do not share staff or operational purpose, they are not a single site of employment, and (d) contiguous buildings owned by the same employer which have separate management, produce difference products, and have separate workforces are separate single sites of employment. *Id.* at §639.3(i)(1) to (5).

The DOL Regulations also address the "unforeseen business circumstances" exception to the 60-day notice requirement. First, they provide that the employer bears the burden of proof that the conditions for the exception have been met. *Id.* at §639.9. They further provide that "an important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside

the employer's control." *Id.* at §639.9(b).  The DOL Regulations dictate an objective standard

for whether business circumstances were not reasonably foreseeable; the employer must exercise

"such commercially reasonable business judgment as would a similarly situated employer in

predicting the demands of its particular market." *Id.* at §639.9(c).

> **C.    The Obetz Affidavit and the Michel Affidavit Meet the Requirements of
>         Federal Rule of Civil Procedure 56(c)(4)**

Before the Court turns to the merits of the Plaintiffs' Summary Judgment Motion, it

addresses the Defendants' argument that the affidavits of Mr. Obetz (the "Obetz Affidavit") and

Mr. Michel (the "Michel Affidavit"), submitted by the Plaintiffs in support of their Summary

Judgment Motion, are conclusory and insufficient to support the motion.  Defendants' Response

Brief, at 4-5.  Citing *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985), the Defendants

argue that statements in the Obetz Affidavit and the Michel Affidavit, which form the basis for

some of the assertions in the Plaintiffs' Summary Judgment Motion, are conclusory and lack

sufficient factual detail.  *Id.* at 7.  The Defendants also argue that the statements in the Obetz

Affidavit and the Michel Affidavit must be subject to special scrutiny because they are not

subject to cross examination.  Defendants' Response Brief, at 7 (citing *In re CitX Corp., Inc.*,

448 F.3d 672, 680 (3d Cir. 2006)).  The Plaintiffs respond that, while the caselaw holds that

affiants cannot testify based on inferences or conclusions regarding matters of which they have

no personal knowledge, Mr. Obetz and Mr. Michel were the highest-ranking officers of Worley

and Ranck and their affidavits' statements address the operations they themselves led.  Plaintiffs'

Reply Brief, at 5.  The Plaintiffs also counter the Defendants' assertion that the affidavits should

be subject to a special scrutiny by arguing that, where the Defendants did not depose the two

most knowledgeable witnesses on the Affiliated Entities' operations, they cannot then assert that

the Obetz Affidavit and the Michel Affidavit should be discounted. *Id.* at 7.

Federal Rule of Civil Procedure 56(c)(4) provides that an affidavit in support of or in opposition to a summary judgment motion "must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant … is competent to testify on the matters stated." F.R.C.P. 56(c)(4). Furthermore, the affiant "must ordinarily set forth facts, rather than opinions or conclusions." *Maldonado*, 757 F.2d at 51. The *Maldonado* court warned an affidavit that is conclusory and lacking in specific facts does not satisfy a summary judgment movant's burden. *Id.* (*citing Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 789-90 (3d Cir. 1978)). In their brief, the Defendants set forth 16 statements from the Obetz Affidavit, the Michel Affidavit, and/or the Plaintiffs' Summary Judgment Brief that the Defendants argue are conclusory and lacking sufficient factual detail. Defendants' Response Brief, at 5-6. After reviewing those statements, however, the Court finds that most are not conclusory; they set forth a factual statement based on the affiant's personal knowledge, as required under Rule 56(c)(4). See Defendants' Response Brief, at 5-6, nos. 2, 4-7, 10-16. By contrast, the *Maldonado* court found an affidavit conclusory because it failed to show any personal knowledge by the affiant of the topic about which he was testifying. *Maldonado*, 757 F.2d at 51. Rather, the affiant's conclusion depended on inference and conjecture about circumstances of which the affiant lacked personal knowledge, which the court found did not satisfy the movant's burden under Rule 56(c)(4). *Id.* (citing what was then Rule 56(e)). Here, as the Plaintiffs argue, Mr. Obetz and Mr. Michel "testify from their own personal knowledge about their own operation of the Enterprise." Plaintiffs' Reply Brief, at 6. As such, the Court finds that the Obetz Affidavit and Michel Affidavit satisfy Rule 56(c)(4) and are not conclusory or lacking sufficient factual detail.

The Court also finds that the "careful scrutiny" the Defendants ask to be applied to the

Obetz Affidavit and the Michael Affidavit is not warranted.  As the Plaintiffs point out in their

response brief, the *CitX* decision the Defendants cite in arguing for a higher level of scrutiny to

be applied to the affidavits does not support that proposition.  The *CitX* court's discussion of the

affidavit before it came in the context of an affiant whose statements in his affidavit contradicted

his subsequent deposition testimony.  *Id.,* 448 F.3d at 679-80.  The court found that the "sham

affidavit" doctrine, where trial courts will disregard an affidavit submitted in opposition to a

motion for summary judgment when it contradicts the affiant's prior deposition testimony,

should also apply where the contradictory deposition testimony occurs subsequent to the

affidavit.  *Id.*  In doing so, the court reasoned that "cross-examining the affiant in a later

deposition seems the better way to finds the flaws in a bogus affidavit," and cited to a chapter of

a federal practice treatise stating that depositions "are one of the best forms of evidence for

supporting or opposing a summary judgment motion" and that affidavits, not being subject to

cross-examination, "are likely to be scrutinized carefully by the court to evaluate their probative

value."  *Id.* (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal

Practice and Procedure* §2722, at 373, 379).  This parenthetical treatise citation appears to be the

basis for the Defendants' assertion that the Obetz Affidavit and Michel Affidavit must be

subjected to a heightened level of scrutiny.  There is a clear distinction, however, between the

context of those two affidavits made by individuals with personal knowledge and no contrary

deposition testimony, and the context in which the *CitX* court was evaluating the affidavit before

it.  While the adversarial inquiry inherent in depositions may offer a more fully-vetted basis for

supporting or opposing summary judgment, nothing in Rule 56(c)(4) suggests that affidavits

meeting its requirements must also be subjected to a heightened scrutiny. *CitX* does not hold

differently.

The Court therefore finds that the Obetz Affidavit and the Michel Affidavit meet Rule

56(c)(4)'s requirements and are properly considered by the Court in ruling on the Plaintiffs'

Summary Judgment Motion.

> **D.    Partial Summary Judgment Will Be Granted in Favor of the Plaintiffs on the
> Limited Issue of Whether the Affiliated Entities Were a Single Employer
> Under the WARN Act**

The Plaintiffs seek partial summary judgment on the limited issue of whether the

Affiliated Entities constituted a single employer under the WARN Act, such that they are

aggregated and are jointly and severally liable for any WARN Act violations the Defendants

committed.  In response, the Defendants concede, solely for purposes of responding to the

Plaintiffs' Summary Judgment Motion, that Worley and Amerigreen Energy were a single

employer under the WARN Act. *See Defendants' Response in Opposition to Plaintiffs['] Motion*

*for Partial Summary Judgment,* Adv. Pro. Docket No. 97, at 4 (the "Defendants' Response

Brief").  However, the Defendants assert that there are genuine disputes of material fact

regarding whether Ranck should be considered a single employer with Worley and Amerigreen

for purposes of the WARN Act. *Id.*[9]  As such, to the extent possible, the Court will only

summarize and address the Parties' competing arguments with respect to whether Ranck should

be aggregated with Worley and Amerigreen as a single employer for purposes of the WARN

---

[9] Although the Defendants' Response Brief states that the Defendants are not disputing single employer
status with respect to Worley and "Amerigreen," which they have defined to mean Amerigreen Energy as
opposed to Amerigreen Propane, the brief only argues that material disputed facts exist as to Ranck.  The
Defendants assert that Amerigreen Propane did not have nay employees at the time they ceased
operations, and the Court therefore understands the Defendants to not concede that Amerigreen Propane
is included as a single employer with Worley and Amerigreen Energy.

Act.

As noted *supra*, the Plaintiffs argue that the Affiliated Entities were a single employer

based on application of the considerations articulated in the DOL Regulations, which the Third

Circuit adopted in *Pearson v. Component Tech Corp.* as the appropriate test to employ for

affiliated corporate liability under the WARN Act. *Pearson*, 247 F.3d at 478. As noted *supra,*

those considerations are (i) common ownership, (ii) common directors and/or officers, (iii) de

facto exercise of control, (iv) unity of personnel policies emanating from a common source, and

(v) dependency of operations. 20 C.F.R. §639.3(a)(2). In determining that the DOL Regulations

set forth the appropriate test, however, the Third Circuit in *Pearson* also observed that the listed

factors are not an exhaustive list, giving rise to a balancing test where circumstances not

specifically enumerated may be relevant. *Id.* As such, the factfinder may consider not only the

enumerated factors, but also "the other indicia of corporate 'sameness' that have characterized

this area of the law, such as nonfunctioning of officers and directors, gross undercapitalization,

and other circumstances that demonstrate a lack of an arm's-length relationship between the

companies." *Id.* The lack of an arms-length relationship between two nominally separate

entities is at the heart of the affiliated corporate liability inquiry. *Id.* at 495-96. The *Pearson*

court viewed the "de facto exercise of control" factor as a "catch-all factor … that has the

potential to tip the balance in an otherwise close case." *Id.* at 490. It allows the factfinder to

consider whether a parent corporation was the final decisionmaker for the challenged practice,

and if the evidence shows that the parent corporation has disregarded the separate legal

personality of its subsidiary in directing the subsidiary to act, such evidence alone may be strong

enough to warrant liability. *Id.* at 496-97.

### 1.      Nature of the Affiliated Entities' Enterprise

The Plaintiffs first assert that the day-to-day operations of the Affiliated Entities were

"deliberately intertwined and interdependent."  Plaintiffs' Summary Judgment Brief, at 3.

Although the Plaintiffs make a number of factual allegations regarding Worley's relationship

with Amerigreen Energy and Amerigreen Propane, with respect to Ranck the Plaintiffs allege

only that Worley acquired it in 2017 to expand its market share of commercial and residential

sales of Heating, Ventilation and Air Conditioning systems ("HVAC").  *Id.*  This fact alone, even

if undisputed, does not in and of itself suggest a lack of arms-length dealing with Worley and

Ranck once it was acquired.

### 2.      Common Ownership

The Plaintiffs assert, and the Defendants concede, that Ranck was a wholly-owned

subsidiary of Americomfort, Inc., which in turn was a wholly-owned subsidiary of Worley.

Plaintiffs' Summary Judgment Brief, at 6; Defendants' Response Brief, at 12.  There is therefore

no genuine dispute of material fact that Worley and Ranck shared ownership.  The Defendants

concede that this factor weighs in favor of the Plaintiffs.  Defendants' Response Brief at 12.

### 3.      Common Directors and Officers

The Plaintiffs assert that Ranck did not have its own board of directors, and that its Chief

Executive Officer, John Michel ("Mr. Michel"), replaced Mr. Lyons in March 2018 as CEO of

Worley while continuing to serve as Ranck's CEO.  Plaintiffs' Summary Judgment Brief, at 6-7.

The Defendants concede that Ranck did not have any directors, and that John Michel served as

the CEO of Worley and Ranck from March to June 2018.  Defendants' Response Brief, at 13.

The Defendants further acknowledge that Mr. Obetz was the President of Ranck in addition to

holding a director and officer position with Worley.  *Id.*  The Defendants concede that this factor

weighs in favor of the Plaintiffs.  *Id.*

### 4.      Unity of Personnel Policies Emanating from a Common Source

The Plaintiffs assert that from a Human Resources ("HR") perspective, the Affiliated

Entities were one company, giving a series of examples in support ranging from shared HR

personnel, record keeping, payroll and benefits services, employee handbooks, and employee

performance management.  Plaintiff's Summary Judgment Brief, at 13-15.  The Defendants

concede there is no genuine dispute of material fact that there was a unity of personnel policies

emanating from a common source for the Affiliated Entities, and that this factor weighs in favor

of the Plaintiffs.  Defendants' Response Brief, at 15.

### 5.      Dependency of Operations

The Plaintiffs assert Ranck was dependent on Worley, with Worley's management

treating Ranck as a division rather than a separate independent company "in its reporting

structure, administration, and its integration into Worley's business."  Plaintiffs' Summary

Judgment Brief, at 8.  Relying on the Michel Affidavit, the Plaintiffs allege that Mr. Michel

reported to Mr. Obetz, oversaw Worley's HVAC service installation and sales departments in

addition to Ranck's operations, and that all Ranck's daily cash deposits needed to "go through"

Mr. Lyons.  *Id.* (citing ¶¶6-8 of the Michel Affidavit).  The Plaintiffs also point to Worley's and

Ranck's consolidated 2016 and 2017 financial statements.  *Id.* at 10, n.10.  The Plaintiffs assert

the Affiliated Entities not only funded their operations through a joint credit facility from Fulton,

with Mr. Lyons having obtained it on behalf of all entities and having signing authority for all

entities' accounts, but that Worley guaranteed a Fulton term loan to Ranck in the amount of $2.1

million and Amerigreen Energy guaranteed a Fulton revolving credit line to Ranck in the amount of $1 million.  *Id.* at 11.  Relying on the Obetz Affidavit, the Plaintiffs allege that Mr. Lyons commingled funds between the Affiliated Entities, including the transfer of a $500,000 credit line from Ranck to Worley, and purchased company vehicles for all Affiliated Entities.  *Id.* at 12 (citing Obetz Affidavit ¶¶29, 31).  Finally, the Plaintiffs assert that the Affiliated Entities shared information technology employees and that "many" employees of the Affiliated Entities worked between the Worley Manheim Office, the Amerigreen Lancaster Office, and Ranck's Lancaster office, including Ms. Goodin and Ms. Becker.  *Id.* at 12-13.

The Defendants do not dispute (a) that Mr. Lyons purchased vehicles for all three entities, and (b) that he transferred a $500,000 line of credit from Ranck to Worley.  Defendants' Response Brief, at 15.  The Defendants dispute the balance of the Plaintiffs' allegations with respect to whether Ranck was dependent on Worley.  *Id*.  As to most of the Plaintiffs' allegations, however, the Defendants do not make specific factual averments supported by evidence which demonstrate a genuine issue of material fact.  The Defendants do dispute that Ranck funded its operations through a joint credit facility from Fulton and that Ranck guaranteed loans to Worley and Amerigreen.  *Id.* at 9-10.  Relying on a declaration of Mr. Hagaman (the "Hagaman Declaration"), the Defendants assert that Ranck had a separate term loan and line of credit guaranteed by Worley and Amerigreen, and that Worley and Amerigreen guaranteed these debts, but Ranck did not guarantee any debts of Worley or Amerigreen.  *See Id.* at Ex. D, ¶¶5-9. These factual responses would only seem to support a finding of dependence; they seem to be a concession that Worley and Amerigreen Energy guaranteed Ranck's debt to Fulton without a reciprocal guarantee from Ranck.  Moreover, the only other evidence the Defendants point to in

arguing that a genuine factual dispute exists is (a) Mr. Hagaman's deposition testimony that

Ranck was legally separate and profitable as of late May 2018 prior to its cessation of operations,

and (b) it was sold less than one month after its bankruptcy filing, which the Defendants argue

demonstrates that Ranck was not "so integrated with Worley and Amerigreen." *Id.* at 15-16.

The Plaintiffs respond that neither of these alleged facts creates a material dispute as to whether

Ranck was dependent on Worley, because profitability is not relevant to whether Ranck was

dependent on the Affiliated Entities. *See Plaintiff's Reply in Support of Motion for Partial

Summary Judgment* ("Plaintiffs' Reply Brief")*,* Bankr. Docket No. 102, at 9.  The Court agrees.

Ranck's profitability does not, by itself, create a genuine dispute of material fact as to its

dependence on Worley, because the profitability could be a product of its dependence, rather

than evidence of its independence.  Where the Defendants have failed to make detailed factual

averments with evidentiary support that contest the facts the Plaintiffs have put forth regarding

Ranck's dependence on Worley, simply alleging Ranck was profitable does not satisfy their

burden.

The Defendants' failure to adequately contest the Plaintiffs' factual averments in support

of a finding of dependence does not result, however, in an automatic finding that this factor

weighs in the Plaintiffs' favor.  The Plaintiffs' undisputed factual averments still must establish

Ranck's dependence on Worley.  The Court finds that based on the undisputed facts, Ranck's

operations were sufficiently dependent on Worley and Amerigreen for this factor to weigh in

favor of the Plaintiffs.  In particular, the Court is persuaded by (a) Ranck's failure to have its

own board of directors, (b) Ranck's CEO reporting to Mr. Obetz, who also oversaw Ranck's

daily cash deposits, (c) Worley's and Amerigreen's guarantee of Ranck's term loan and revolver

from Fulton, and (d) the sharing of IT and HR employees between the Affiliated Entities.  The

Court views these undisputed facts, taken together, as indicative of Ranck's operational

dependence on Worley.  These circumstances reflect a high degree of integration whereby Ranck

relied on Worley to a significant degree for the ordinary operation of its business, supporting a

finding of dependency of operations for purposes of the DOL Regulations.  *Compare Cruz v.*

*HMR Foods Holding, LP (In re HMR Foods Holding, LP)*, 602 B.R. 855, 871-72 (Bankr. D. Del.

2019) (noting the "high degree of integration" standard for finding dependency of operations, but

finding the WARN Act plaintiffs failed to allege shared administrative or purchasing services,

interchanged employees or equipment, or commingled bank accounts or finances sufficient to

show reliance).  The Court therefore finds this factor weighs in favor of the Plaintiffs.

### 6.    De Facto Exercise of Control

The Plaintiffs allege that Mr. Lyons and Mr. Obetz had final hiring and firing authority

for all employees of the Affiliated Entities, and when Mr. Michel wanted to hire new managers

for Ranck, Mr. Obetz had to authorize any such hiring.  Plaintiffs' Summary Judgment Brief, at

15-16.  According to the Plaintiffs, Mr. Obetz's singular authority over the hiring and firing of

Ranck's employees was exercised on June 4, 2018, when he ordered Ranck's closure and the

termination of all Ranck employees, as he had done with Worley and Amerigreen Energy.  *Id.* at

17 (citing the Obetz Affidavit at ¶51 and the Michel Affidavit at ¶19).  The Plaintiffs allege Mr.

Obetz called Mr. Michel on that date and told him to notify the Ranck employees of the closure

and their termination.  *Id.*  Mr. Obetz did this, the Plaintiffs assert, as a function of his ownership

of the Affiliated Entities rather than as a director or officer: "When ordering the closure and

terminations, [Mr. Obetz] did not engage in separate decision-making processes regarding what

to do with Worley, Amerigreen and Ranck.  He gave no thought to his title at Worley versus

Amerigreen, or the fact that he was not an officer of Ranck.  It was a single decision that he

made as an owner.  [Mr.] Michel … did not have the ability to refuse his instruction to close …

Ranck and terminate the employees there." *Id.* at 17-18 (citing the Obetz Affidavit at ¶52 and

the Michel Affidavit at ¶10).

In response, the Defendants argue that a factual dispute exists as to the circumstances of

Ranck's closure and Mr. Obetz's authority to order the closing.  Defendants' Response Brief, at

14.  The Defendants assert that Mr. Obetz's "overlapping roles at Worley and Ranck create a

dispute of fact as to whether he was exercising his authority to close Ranck as Ranck's President

or, as he now claims, without any regard to that authority." *Id.*  The Defendants also argue that

even if Mr. Obetz states in his affidavit that he disregarded his own corporate titles and positions

when ordering the closure, this does not establish that *Worley or Amerigreen* exercised de facto

control over Ranck, because Mr. Obetz has not stated that he ordered closure through his

position with either entity.  *Id.*  According to the Defendants, this creates a factual dispute as to

whether Worley or Amerigreen exercised de facto control over Ranck.  *Id.*  The Plaintiffs

respond that there is no factual dispute where Mr. Obetz's testimony "was that he did not regard

his official roles at any of the entities, but that he made the decision as owner of the Enterprise as

a whole."  Plaintiffs' Reply Brief, at 11.  Moreover, the Plaintiffs argue, even where a subsidiary

wants to close, the parent company's authorization to do so constitutes a direction "where the

subsidiary was so controlled by the parent that it lacked the ability to make any decisions

independently."  *Id.* (citing *Guippone v. BH S&B Holdings LLC*, 737 F.3d 221, 227 (2d Cir.

2013)).

As discussed *supra,* the *Pearson* court viewed the "de facto exercise of control" factor as allowing consideration of both whether two entities shared the same labor policies and whether the parent entity directly exercised control over the particular policy at issue, *i.e.*, whether it specifically directed the allegedly illegal employment practice that forms the basis for the litigation*. Pearson*, 247 F.3d at 490.  As the *Pearson* court put it, "If the evidence of the parent's control with respect to the practice is particularly egregious – for instance, if the parent corporation has disregarded the separate legal personality of its subsidiary in directing the subsidiary to act, such evidence alone might be strong enough to warrant liability." *Id.* at 496. Here, the allegedly illegal employment practice forming the basis of the Plaintiffs' action is the Defendants' failure to provide the notice and benefits required under the WARN Act prior to ceasing operations and terminating all employees.

Because the Defendants have conceded single employer status for Worley and Amerigreen, the only question is whether Worley, through Mr. Obetz, exercised de facto control over Ranck in ordering the terminations of all Ranck employees without complying with the WARN Act's requirements.  Mr. Obetz's uncontroverted testimony is that on June 4, 2018, he ordered the closure of Ranck and the termination of its employees, "as a function of [his] ownership of the business, not [his] official title or membership on the Board of any entity … [He] gave no thought to [his] title at Worley versus Amerigreen, or the fact that [he] was not an officer of Ranck.  It was a single decision [he] made as an owner."  Obetz Affidavit, at ¶52.  Mr. Michel's uncontroverted testimony is that when Mr. Obetz ordered the immediate closure of Ranck and the termination of its employees on June 4, 2018, he "knew that [he] had to do so." Michel Affidavit, at ¶¶19-20.  Therefore, the only evidence the Court has is that the owner of

Worley, which was the parent of Ranck, made the unilateral decision to close Ranck and

terminate its employees on June 4, 2018, and that the leadership of Ranck was powerless to do

anything but implement that directive.

      The Defendants argue that a dispute exists as to the capacity in which Mr. Obetz ordered

the closing of Ranck and the termination of its employees, but Mr. Obetz's testimony is clear and

uncontroverted: he did so as owner of the Affiliated Entities, without regard to any position he

may or may not have had.  This evidences that "the parent corporation has disregarded the

separate legal personality of its subsidiary in directing the subsidiary to act [with respect to the

challenged practice]," *see Pearson*, 247 F.3d at 496, and warrants a finding that Worley

exercised de facto control over Ranck in directing the termination of Ranck's employees.  The

Court rejects the Defendants' assertion that a factual dispute exists because the Obetz Affidavit

does not state that Mr. Obetz ordered Ranck's closure through his position with Worley.  Mr.

Obetz's testimony is that he ordered the closure of Ranck, as well as Worley and Amerigreen

Energy, as the owner of the business.  This, together with Mr. Michel's testimony that he had no

choice but to follow Mr. Obetz's directive, sufficiently demonstrates that Ranck lacked authority

of its own as to when and how to close and terminate its employees, that such authority flowed

up to Worley as Ranck's parent, and ultimately to Worley's owner, and that Ranck's nominal

corporate separateness never entered the equation when the directive was issued and

implemented.  Therefore, while the Defendants are correct that a parent's exercise of control

pursuant to the ordinary incidents of stock ownership will not ordinarily give rise to single

employer status, see Defendants' Response Brief at 13 (quoting *Pearson*, 247 F.3d at 503), here

such a finding is warranted because "the de facto exercise of control was particularly striking

[because] . . . effectuated by disregarding the separate legal personality of its subsidiary."

*Pearson*, 247 F.3d at 503 (quoting *Esmark, Inc. v. NLRB*, 887 F.2d 739, 757 (7th Cir. 1989).

### 7.     Conclusion

The Court finds, after application of the considerations outlined in the DOL Regulations and endorsed by the Third Circuit in *Pearson*, that Worley, Amerigreen Energy, and Ranck constituted a single employer for purposes of the WARN Act, and therefore were, together, an "employer" under §2101(a)(1) of the WARN Act.  The Court will therefore grant the Plaintiffs' Summary Judgment Motion on this limited issue.

### E.     Disputed Material Facts Preclude Partial Summary Judgment for the Defendants Based on the Unforeseen Business Circumstances Exemption

The Defendants seek partial summary judgment on a broader basis than the Plaintiffs. With the exception of a fraction of the May 21st Laid Off Employees, the Defendants assert that they are entitled to summary judgment with respect to all other terminated employees because the unforeseeable business circumstance exemption to the WARN Act applies.[10]  The Court finds that material factual disputes preclude granting partial summary judgment to the Defendants on this basis.

### 1.     Whether the Defendants' WARN Act Obligations Were Triggered On March 22, 2018 Requires Further Factual Development

As noted *supra*, the Defendants assert that Fulton pulling funding from the Affiliated Entities on June 4, 2018, was an unforeseen business circumstance that prompted their closure, and therefore they did not have WARN Act obligations prior to that date, other than with respect

---

[10] The Defendants only seek partial summary judgment because they concede that 21 of the 34 employees laid off on May 21st did not receive notices as required by the WARN Act, and the Defendants therefore do not dispute those employees' claims.  See Defendants' Summary Judgment Brief, at 8, n.3.

to the May 21ˢᵗ Laid Off Employees.  The Plaintiffs, on the other hand, assert that the trigger date

was March 22, 2018, which is 60 days prior to the May 21ˢᵗ Layoff, because the Defendants

knew on that date that their closure and the termination of their employees was probable.

The Defendants acknowledge that application of the unforeseen business circumstances

exemption depends on whether the employer "in the exercise of 'commercially reasonable

business judgment' could have foreseen the particular circumstances that caused the closing."

*Hotel Employees Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 180 (3d Cir.

1999) (quoting 20 C.F.R. §639.9(b)(2)).  Important indicators of what might constitute an

unforeseeable business circumstance are that it was sudden, dramatic, unexpected, and outside of

the employer's control.  *Id.*  The Department of Labor's implementing regulations on the

exemption provide that whether business circumstances were not reasonably foreseeable

"focuses on an employer's business judgment.  The employer must exercise such commercially

reasonable business judgment as would a similarly situated employer in predicting the demands

of its particular market."  20 C.F.R. §639.9(b)(2).  The Court must therefore evaluate whether a

similarly situated employer in the exercise of commercially reasonable business judgment would

have foreseen, prior to June 4, 2018, the Defendants needing to cease operations.  *Hotel*

*Employees*, 173 F.3d at 186.[11]

Furthermore, as the Defendants correctly argue, the WARN Act is only triggered once a

mass layoff becomes probable, meaning the point "when the objective facts reflect that the layoff

was more likely than not."  *Varela v. AE Liquidation, Inc. (In re AE Liquidation)*, 866 F.3d 515,

530 (3d Cir. 2017) (joining every Circuit to have considered the issue in adopting the probability

---

[11] The *Hotel Employees* court went on to state that this determination is made in light of the history of the

standard).  The *AE Liquidation* court explained the rationale for the probability standard:

"Companies in financial distress will frequently be forced to make difficult choices on how best

to proceed, and those decisions will almost always involve the possibility of layoffs if they do

not pan out exactly as planned.  If reasonable foreseeability meant something less than a

probability, nearly every company in bankruptcy, or even considering bankruptcy, would be well

advised to send a WARN notice, in view of the potential for liquidation of any insolvent entity

… When the possibility of a layoff – while present – is not the more likely outcome, such

premature warning has the potential to accelerate a company's demise and necessitate layoffs

that otherwise may have been avoided."  *Id.* at 530.

### a.    The Defendants Assert WARN Was Triggered on June 4, 2018

The Defendants point to Fulton's abrupt termination of funding on June 4, 2018,

stemming from Mr. Lyons' fraudulent activities, as an unforeseeable business circumstance that

prompted their immediate cessation of business and termination of all remaining employees

without prior issuance of WARN Act notices.  Defendants' Summary Judgment Brief, at 6.  The

Defendants argue that Mr. Lyons' fraud was not discovered until May 15, 2018, and in the time

between that discovery and Fulton's decision to cease funding, the Defendants' management was

engaged in efforts to "address the consequences [of Mr. Lyons' actions] and attempt to preserve

the businesses as a going concern."  *Id.*

Pointing to the efforts their management engaged in between May 16th and June 4th to

save the business as a going concern, the Defendants argue they responded reasonably to the

circumstances presented by Mr. Lyons' fraud, and that it would have been unreasonable for them

---

business and of the industry in which the business operated.

to issue WARN Act notices earlier out of an assumption Fulton would terminate funding in
response to the fraud.  Defendants' Summary Judgment Brief, at 8-9.  As the Defendants see it,
"Before June 4, 2018, there was no specific notice or indication that Fulton was going to
completely terminate its banking/lending relationship with the Debtors, and the Debtors should
not be held to a higher standard than what is required under the WARN Act based merely on the
possibility that Fulton might do so."  *Id.* at 9.

> **b.      The Plaintiffs Assert the Unforeseen Business Circumstance
> Exemption is Inapplicable Because WARN Was Triggered on
> March 22, 2018**

The Plaintiffs counter that the Defendants are not entitled to summary judgment based on
the unforeseen business circumstances exemption.  The Plaintiffs argue that the Defendants
cannot be heard to argue Fulton's termination of funding on June 4th was unforeseen from the
perspective of an objective observer exercising commercially reasonable business judgment, in
light of the fact that Mr. Lyons had been defrauding Fulton for over a decade, resulting in over
$50 million of funding.  Plaintiffs' Response Brief, at 18.  Rather, The Plaintiffs argue that as of
March 22nd, the Defendants had a non-viable business with no ability to operate on its own,
sustained only by fraud used to obtain $50 million of financing from Fulton, and that "a
commercially reasonable person aware of the facts prior to the disclosure … would have found it
probable that the company could not reasonably continue to operate, needed to let go its
employees, and thus had to provide notice ahead of time or else violate the WARN Act."  *Id.* at
21-22.  The Plaintiffs argue, therefore, that the Defendants' arguments as to the actions they took
after May 15th to save the business are irrelevant, because layoffs were probable as of March
22nd.  *Id.* at 22.

In making that argument, the Plaintiffs assert that as a matter of both the WARN Act and agency law, the Defendants cannot ignore facts surrounding Mr. Lyons' fraud that were in their possession prior to June 4th. *Id.*  First, the Plaintiffs argue, the Defendants cannot establish the unforeseen business circumstances exemption by disregarding the objective fact of Mr. Lyons' fraud, nor have they established as a factual matter that others were unaware of the fraud.  *Id.* Second, the Plaintiffs argue that as a matter of agency and corporate law, the Defendants, as principal, are imputed with the knowledge of Mr. Lyons, as agent, and therefore should be charged with knowledge of the circumstances that led to Fulton's cessation of financing far earlier than May 15, 2018, when the fraud was allegedly discovered.  *Id.* at 9.

> **c.** **Whether the Defendants' WARN Obligations Were Triggered on March 22, 2018 Cannot Be Determined at the Summary Judgment Stage**

The Plaintiffs' argument that the Defendants knew as of March 22nd that their business was failing and layoffs were probable hinges on either (a) the knowledge of Mr. Lyons and the Controllers being imputed to the Defendants, or (b) the Defendants' management having actual knowledge of Mr. Lyons' fraud and the true state of the Defendants' business absent the fraud. Both of these legal theories requires further factual development for the Court to make a determination.

Turning first to the latter, the Plaintiffs assert that whether anyone else knew of Mr. Lyons' fraud prior to May 15th is an unanswered question of fact because the Defendants have failed to proffer evidence establishing their officers, executives, and board members did not know of the fraud.  *Id.* at 23.  In the absence of such evidence, the Plaintiffs argue, they are entitled to "the most reasonable inference" that other corporate representatives knew of the fraud.

*Id.*  The Plaintiffs, as the nonmovants, are entitled to all reasonable inferences being drawn in

their favor.  *Kohn v. Woods*, 541 Fed. Appx. 163, 166 (3d Cir. 2013).  The Court does not

believe, as the Plaintiffs assert, that they are entitled to an inference that members of the

Defendants' management knew of Mr. Lyons' fraud.  However, the Court finds that the evidence

submitted in support of the Defendants' Summary Judgment Motion does not establish that no

other member of management knew of the fraud; while Mr. Hagaman's testimony supports the

conclusion that *he* was not aware of Mr. Lyons' fraud prior to May 15th, a finding that no other

members of management were aware would require an inference in favor of the Defendants,

which the Court is prohibited from making at the summary judgment stage.  *Cornell & Co. v.*

*SEPTA (In re Cornell & Co.*), 1997 Bankr. LEXIS 1753, at *12-13 (Bankr. E.D. Pa. Nov. 7,

1997).  As such, the Court cannot rule as a matter of law that Defendants' management did not

have actual knowledge of Mr. Lyons' fraud prior to May 15th.

The other side of the Plaintiffs' argument that March 22nd was the trigger date for the

Defendants' WARN Act obligations hinges on the legal position that, even if no other members

of management had knowledge of Mr. Lyons' fraud and the Defendants' otherwise failing

business, Mr. Lyons' knowledge is imputed to the Defendants.  *See* Plaintiffs' Response Brief, at

24, 32-44.  The Plaintiffs argue that under well-established corporate and agency law, "where

company officials act within their authority and for the benefit of a corporation, their actions and

knowledge are indistinguishable from that of the corporation."  *Id.* at 33.  The Plaintiffs assert

this is supported by (a) Pennsylvania and Third Circuit corporate law holding that the knowledge

of high-ranking corporate leaders is considered the knowledge of and imputed to the corporation,

*id.* at 33-34, and (b) Pennsylvania agency law holding that a principal is vicariously liable for the

acts of its agents, *id.* at 36-37.

The Plaintiffs assert that Mr. Lyons' fraudulent activity can be considered within the

scope of his authority, citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267

F.3d 340, 343 (3d Cir. 2001), because in the Third Circuit "courts impute the fraud of an officer

to a corporation when the officer commits the fraud (1) in the course of his employment, and (2)

for the benefit of the corporation."  Plaintiffs' Response Brief, at 37.  They argue first that the

Defendants do not dispute that Mr. Lyons' fraud was committed in the course of his

employment.  *Id.*[12]  The Plaintiffs then assert that Mr. Lyons was acting within the scope of his

authority in obtaining loans from Fulton and preparing the financial statements with the

Controllers, and that such loans benefitted the Defendants by allowing the business to stay

operational and grow.  *Id.* at 37, 43-44.

The crux of the dispute between the Parties with respect to imputation is whether Mr.

Lyons' fraud can be found to have been for the benefit of the corporation.  The Defendants argue

that under the adverse-interest exception to imputation, "fraudulent conduct of a corporate

officer is not imputed to the corporation if the 'agent acts in his own interest, and to the

corporation's detriment."  Defendants' Summary Judgment Brief, at 11 (quoting *Off. Comm. of*

*Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v. PriceWaterHouseCoopers,*

---

[12] In asserting the Defendants have made this concession, the Plaintiffs cite page 15 of the Defendants'
Summary Judgment Brief.  The Court's review of both that page and the Defendants' Summary Judgment
Brief in general does not reveal any admission that Mr. Lyons' fraud was committed in the course of his
employment.  However, in their reply to the Plaintiffs' Response Brief, the Defendants do not contest that
Mr. Lyons' fraud was committed in the course of his employment.  *See* Defendants' Reply Brief, at 2-3.
The Defendants instead focus only on whether the fraud was for the benefit of the corporation.  *Id.*  As
such, the Defendants apparently concede that Mr. Lyons' fraud was committed in the course of his
employment.  *See In re U.S. Physicians, Inc.*, 1999 Bankr. LEXIS 784, at *11-*12 (Bankr. E.D. Pa. June
30, 1999) (where response brief failed to address arguments presented in opening brief, issue was treated
as conceded).

*LLP*, 989 A.2d 313, 333 (Pa. 2010)).  Mr. Lyons' fraud did not confer a benefit to the

Defendants, they contend, because it rendered them insolvent.  *Defendants' Reply Brief in*

*Support of their Motion for Partial Summary Judgment*, Adv. Pro. Docket No. 104, at 2 (the

"Defendants' Reply Brief").  Rather, the Defendants argue, Mr. Lyons' fraud was self-interested,

allowing him to divert approximately $1 million from the Defendants to pay personal credit card

expenses and other personal obligations and to purchase a $100,000 certificate of deposit with

his wife.  *Id.* at 3.  The Defendants also assert that fraudulent conduct of a corporate officer is not

imputed where it involves misrepresentation of corporate finances or leads to insolvency.  *Id.*

(citing *Allegheny Health*, 989 A.2d at 313 and *Thabault v. Chait*, 541 F.3d 512, 529 (3d Cir.

2008), respectively).  Based on these principles, the Defendants argue, Mr. Lyons' fraudulent

conduct is not imputed to them because it was conducted in secret and led the Affiliated Entities

to insolvency.  Defendants' Summary Judgment Brief, at 12.

      The Plaintiffs, of course, disagree that the adverse-interest exception to imputation

applies here.  First, with respect to whether Mr. Lyons' fraud benefited the Defendants, the

Plaintiffs argue that, under Pennsylvania agency law, the fraud does not need to be committed

solely for the benefit of an agent for the adverse interest exception to apply; if the agent is acting

for the principal's interests, the fact that their interests are not totally aligned does not prevent the

agent's knowledge from being imputed to the principal.  Plaintiffs' Response Brief, at 39 (*citing*

*Gordon v. Cont'l Cas. Co.*, 319 Pa. 555, 577 (1935)).  The Plaintiffs assert that Mr. Lyons' fraud

benefitted the Defendants for years, allowing them to maintain operations, grow the business,

increase market share, pay expenses, and generate profits, Plaintiffs' Response Brief at 43-44,

and that whether Mr. Lyons diverted some company funds for his personal use is irrelevant to his

defrauding Fulton for the benefit of the Debtors.  *See Plaintiffs' Surreply in Opposition to Defendants' Motion for Partial Summary Judgment*, Bankr. Docket No. 107, at 3-4 ("Plaintiffs' Surreply Brief").  Second, with respect to the Defendants' assertion that fraudulent conduct of a corporate officer is not imputed where it involves misrepresentation of corporate finances or leads to insolvency, the Plaintiffs contend that neither rule exists and that "Defendants' reliance on *Allegheny Health* and *Thabault* is misplaced because both cases arise in a highly specific context where normal rules of imputation are at odds with opposing public policy: litigation between corporations and their own auditors."  Plaintiffs' Response Brief, at 40-41.  Moreover, the Plaintiffs argue, *Thabault* is inapplicable because it was decided under New Jersey law, whereas Pennsylvania law *does* impute fraudulent conduct leading to insolvency because of the immediate benefit to the Company, regardless of its ultimate consequence.  Plaintiffs' Surreply Brief, at 4.  Finally, the Plaintiffs assert that the adverse-interest defense is inapplicable based on the "sole actor exception," which holds that where an agent is a sole representative of the principal, his actions are imputed to the principal regardless of whether he is acting adversely to the principal.  Plaintiffs' Response Brief, at 43 n.28.  The Plaintiffs assert Mr. Lyons operated without meaningful board oversight, satisfying the sole actor exception.  *Id.*  The Defendants respond that the sole actor exception does not apply because Lyons was not the sole representative of the Defendants, which had other corporate officers and directors sharing in the management of the business.  Defendants' Reply Brief, at 4.

First, the Court is not persuaded by the Plaintiffs' argument regarding the sole actor exception.  It is not clear, based on the undisputed facts, that Mr. Lyons was the sole representative of the Defendants vis-à-vis Fulton or any other party.  Mr. Lyons may have been

responsible for negotiating funding with Fulton and preparing financial statements, but the
evidence submitted does not reflect that he was Fulton's sole point of contact or that others were
not involved in funding discussions with Fulton.  Moreover, the sole actor exception "is applied
to cases in which the agent who committed the fraud was the sole shareholder of the corporation
or dominated the corporation." *Thabault*, 541 F.3d at 529.  The undisputed facts do not establish
the applicability of this exception.

Second, the Court believes a further factual record is needed as to whether Mr. Lyons'
fraud was for the benefit of the Defendants as principals.  The Plaintiffs may be correct that,
even though the Defendants ultimately were rendered insolvent, the financing from Fulton, based
on Mr. Lyons' fraudulent financial statements, conferred at least a short term-benefit to the
Defendants that prevents application of the adverse-interest exception.  *See Allegheny Health*,
605 Pa. at 275-276 (noting the lower court's citation to *Baena v. KPMG LP*, 453 F.3d 1, 7-8 (1st
Cir. 2006), holding that management's fraudulent overstatement of earnings was not in the long-
term interest of the company but did profit the company in the first instance, even if creating
civil and criminal liability, and it was irrelevant if management also saw benefits to themselves).
However, the Court finds that further factual development as to why Mr. Lyons' fraud was
undertaken is necessary.

The Court is persuaded by the decision in *Phar-Mor, Inc. v. Coopers & Lybrand (In re
Phar-Mor, Inc. Sec. Litig.)*, 900 F. Supp. 784 (W.D. Pa. 1995), a case not cited by either Party.
In *Phar-Mor* the court addressed whether, at the summary judgment stage, the wrongful acts of
certain of the plaintiff corporation's officers and employees should be imputed to the corporation
as a matter of law, so as to bar the corporation's claims against its former auditors for alleged

accounting malpractice.  The corporation admitted that certain former officers masterminded the

false portrayal of the corporation as a profitable concern but alleged that the former auditors

negligently failed to detect the financial fraud, instead issuing a series of clean audit opinions.

*Id.* at 785-786.  The auditors asserted that the knowing participation of corporate officers in the

fraud had to be imputed to the corporation, precluding the corporation from recovering damages

from its own fraud.  *Id.* at 786.  The *Phar-Mor* court noted the general rule that the fraud of an

officer is imputed to the corporation when the officer's fraudulent conduct was (1) in the course

of the officer's employment, and (2) for the benefit of the corporation.  *Id.* (citing *Rochez Bros.,*

*Inc. v. Rhoades*, 527 F.2d 880, 884 (3d Cir. 1975)).  The court also noted the exception to

imputation where the officer secretly acts adverse to the corporation and entirely for his own

benefit.  *Id.* (citing *F.D.I.C. v. Shrader & York*, 991 F.2d 216 (5th Cir. 1993)).  The *Phar-Mor*

court then concluded that genuine issues of material fact precluded the entry of summary

judgment on the imputation issue.  The court found that while there was testimony from the

corporation's former executives that the motivation behind the fraud and resultant cover up was

to provide time for management to resolve the corporation's underlying business problems, that

motivation did not necessarily equate to a finding that the fraudulent actors intended to benefit

the corporation.  *Id.* at 787.  Rather, "a reasonable trier of fact could conclude that the true

motive of the wrongdoers was the preservation of their employment, salaries, emoluments and

reputations, as well as their liberty, at the expense of [the corporation's] well-being."  *Id.*

The Court agrees, at the summary judgment stage, with the *Phar-Mor* court's approach.

It is not clear to the Court as a matter of law, based on the evidence cited, that Mr. Lyons and the

Controllers fraudulently "cooked the books" to benefit the Defendants, as opposed to being

motivated by their own self-interest and self-preservation.  It is no doubt true that Fulton loaned

millions of dollars to the Defendants that it might not have otherwise loaned had it known of

their true financial condition, just as the corporation in *Phar-Mor* received clean audits it

otherwise would not have received had its officers' fraud been detected.  That fact, however, is

not dispositive as to whether Mr. Lyons and the Controllers engaged in the fraud to benefit the

Defendants.  The *Phar-Mor* court pointed to the testimony of one of the corporate fraudsters that

he knew the corporation's directors were making critical business decisions based on false

financial information, including an aggressive expansion program of stores that were ultimately

unprofitable and increased corporate losses, which they would not have otherwise made,

resulting in the corporation "[digging itself] a bigger grave." *Id.* at 787.  So too, it is possible

here that Mr. Lyons and the Controllers engaged in their fraudulent acts knowing, in light of the

Affiliated Entities' true financial picture, that the continued borrowings from Fulton based on the

fraudulent financials were in fact <u>not</u> beneficial to the Defendants because they were likewise

digging a bigger grave of insurmountable debt.

This factual issue precludes summary judgment for the Defendants because the Court

cannot determine, at this stage of the proceeding, whether the Defendants are imputed with Mr.

Lyons' knowledge as of March 22nd and should have known at that point that the business would

fail, Fulton would pull funding, and the Defendants' employees would be terminated.

### 2.    Whether the Defendants' WARN Act Obligations Were Triggered Prior to June 4, 2018 Requires Further Factual Development

Even if the Defendants are not imputed with Mr. Lyons' knowledge as of March 22nd,

that does not automatically equate to a finding that the Defendants did not become obligated to

comply with the WARN Act on a date prior to June 4th based on application of the unforeseen

business circumstance exception.  As discussed *supra,* the unforeseen business circumstance

exception requires that an event leading to a plant closing be sudden, dramatic, unexpected, and

outside of the employer's control.  The Court finds that whether Fulton's cessation of funding

meets this exception requires further factual development.

The Defendants contend that after discovering Mr. Lyons' fraud on May 15, 2018, they

engaged in a series of discussions and negotiations with Fulton in an attempt to save at least

some part of the business.  However, the Plaintiffs dispute the Defendants' version of many of

those events (in addition to asserting that events after May 15th are irrelevant because March 22nd

was the WARN Act trigger date).  The overall nature of the factual dispute is what and how

Fulton was communicating to the Defendants' management between May 15th and June 4th, what

the Defendants' management was learning about the true state of the Defendants' financial

outlook during those weeks, and what management should have understood about the future of

the Defendants' business based on those communications and outlook.  *See Plaintiffs' Response*

*to Defendants' Statement of Undisputed Material Facts and Plaintiffs' Statement of Additional*

*Material Facts* (the "Factual Disputes").[13]  For example:

- The Defendants assert their representatives met with Fulton on May 21st to

  discuss "the future of Debtors and related entities."  The Plaintiffs do not dispute

  that such a meeting occurred but assert that Fulton representatives made no

  indication at the meeting that Fulton supported a plan that would have allowed

  any part of the business to survive.  (Factual Dispute No. 24)

- The Defendants assert that at the May 21st meeting the parties discussed possible

---

[13] Adv. Pro. Docket No. 98-1.

scenarios for the Defendants to survive.  The Plaintiffs assert that all of

management's proposals required additional funding from Fulton, which Fulton

refused to give and instead suggested an immediate shut down.  According to the

Plaintiffs, Fulton made no indication at the May 21st meeting that it would support

a plan that would permit the Defendants' business to survive.  (Factual Dispute

Nos. 25, 28)

- The Defendants assert that after Mr. Lyons' fraud was discovered on May 15th,

  management reviewed the status of the business, the state of financing, and

  strategy to continue, shutdown, or sell the businesses, fully or partially.  The

  Plaintiffs assert that once Fulton pulled the line of credit, management knew all

  cash would be depleted within a week, and that the Defendants would need to

  discontinue at least parts of the businesses to remain viable in the short term.

  (Factual Dispute No. 26)

- The Defendants assert that management's consideration of options for survival

  did not include their continuation as separate legal entities.  The Plaintiffs dispute

  that management had the power to choose between options at all, asserting that

  only Fulton could choose whether and to what extent the businesses would

  survive.  (Factual Dispute Nos. 28, 31)

- The Debtors assert that Mr. Hagaman believed the Defendants could survive

  through the summer of 2018.  The Plaintiffs assert Mr. Hagaman knew that once

  Fulton terminated the line of credit, the Defendants would run out of cash by May

  29th, and that the only option that might allow the Defendants to survive through

the summer of 2018 would have required a $1 million cash infusion from Fulton.

(Factual Dispute No. 30)

The above Factual Disputes are but a portion of the material disputed facts between the Parties, with each drawing on different parts of the factual record to support their positions, including different portions of the deposition testimony of Mr. Hagaman.  The Court cannot determine whether management should have known, prior to June 4th, that cessation of the business and termination of employees was probable without a more fulsome factual record developed at trial of the discussions between the Defendants' management and Fulton, as well as the Defendants' internal discussions.

### 3.  Even if the WARN Act Was Triggered Only on June 4, 2018, Whether the Defendants Complied With Their Obligations Requires Further Factual Development

Even if the Defendants are correct that their WARN Act obligations were not triggered until Fulton pulled funding from the Defendants on June 4th, factual disputes still exist as to whether the Defendants complied with such obligations.  The Defendants assert that employees terminated on June 4th were issued WARN Act notices.  The Court believes there are sufficient disputed facts, however, regarding whether the notices were properly sent to warrant trial on the issue.  The Plaintiffs point to testimony from Ms. Goodin that, although she was responsible for mailing the WARN Act notices, she could not recall doing so or receiving one.  Defendants point to contrary testimony from Mr. Hagaman and Ms. Becker.  Moreover, the Plaintiffs challenge the reliability of the postal service receipt cards purportedly verifying the mailing of the WARN Act notices, including citing evidence suggesting that Mr. Hagaman signed receipt cards other than his own.  See Factual Dispute No. 54.  The Court believes these factual disputes require trial and

an opportunity for the Court to weigh the credibility of the witnesses and their testimony.

### 4.    Conclusion

At trial it will be the Defendants' burden to establish that the unforeseen business

circumstance exception applies.  *Seven Seas Petroleum, Inc. v. Cibc World Mkts. Corp.*, 2013

U.S. Dist. LEXIS 101112, at *40 (S.D. Tex. July 19, 2013).  As set forth in the above discussion,

however, the Court cannot find on the present record that the exception is or is not applicable as

a matter of law.

### F.    Disputed Material Facts as to Single Site of Employment Preclude Partial Summary Judgment for the Defendants

The Defendants assert that even if the unforeseen business circumstances exemption does

not apply, they are at least entitled to partial summary judgment with respect to any WARN

Class members who were employed at locations with less than 50 employees, because such

locations did not qualify as "plant closings" under the WARN Act.  As noted *supra*, the term

"plant closing" means "the permanent or temporary shutdown of a single site of employment, or

one or more facilities or operating units within a single site of employment, if the shutdown

results in an employment loss at the single site of employment during any 30-day period for 50

or more employees excluding part-time employees." 29 U.S.C. §2101(a)(2).  The DOL

Regulations provide, among other things, that separate buildings or areas may be considered a

single site of employment if they are in reasonable geographic proximity, used for the same

purpose, and share the same staff and equipment, but to the extent non-contiguous sites do not

share staff or operational purpose, they are not a single site of employment.  20 C.F.R. §639.3(3).

The Defendants assert that Amerigreen Energy employees were not employed at a single

site of employment that suffered employee losses of 50 or more employees, because only 33

Amerigreen Energy employees regularly reported for work at the Amerigreen Lancaster Office.

Defendants' Summary Judgment Brief, at 15.  The Defendants argue that these employees are

not covered by the WARN Act and summary judgment should be entered with respect to their

claims.  *Id.*  The Defendants argue that their various locations should not be aggregated to meet

the "single site of employment" requirement because the DOL test, which is conjunctive in

nature, is not satisfied.  *Id.*  The Defendants contend that the undisputed facts show that the

Worley Manheim Office and the Amerigreen Lancaster Office were a 15-minute drive away

from each other in separate municipalities, and therefore not in the same geographical location.

*Id.*  The Defendants also assert there is insufficient record evidence that employees were shared

between locations.  *Id.*  Finally, the Defendants argue that although both were broadly engaged in

the energy industry, Worley and Amerigreen Energy were engaged in different business

purposes because they concentrated on different products and services.  *Id.*  Worley provided

various products and services, including home heating oil, propane, and natural gas, as well as

heating ventilation and air conditioning services, while Amerigreen Energy was a wholesale fuel

distributor.  *Id.*  As such, according to the Defendants, any employees who may have been shared

between Worley and Amerigreen Energy facilities were not engaged in the same activities for the

same operational purpose, precluding a finding that Worley and Amerigreen Energy's facilities

can be considered a single site of employment.  *Id.*

The Plaintiffs argue that the Worley and Amerigreen Energy facilities qualify as a single

site of employment for two separate reasons.  They first argue that application of the three-factor

test under the DOL Regulations supports a finding of a single site of employment.  They assert

the Worley and Amerigreen Energy facilities, at 7.6 miles and a 15-minute drive apart, were in

the same reasonable geographic proximity, and the fact that they were in different municipalities is not dispositive and represents a cramped reading of the regulatory language.  Plaintiffs' Response Brief, at 50.  The Plaintiffs also argue that the two facilities were used for a common purpose – selling Amerigreen Energy's fuel products and its electric and natural gas brokerage services.  *Id.*  Finally, the Plaintiffs assert that the two facilities shared staff because "numerous" employees directly employed by Amerigreen Energy "frequently" traveled to the Worley Manheim Office to perform their job duties, and vice-versa, and because direct employees of Worley, Amerigreen Propane, and Ranck "regularly convened" with direct employees of Amerigreen Energy at the Amerigreen Lancaster Office.  *Id.* at 51.

The Plaintiffs also assert a second basis for finding the Worley and Amerigreen Energy facilities were a single site of employment.  The Plaintiffs look to §639.3(i)(8) of the DOL Regulations, which provide that the requirement may be satisfied in a "truly unusual organizational situation" where the other criteria do not reasonably apply.  *Id.* at 47-48.  Citing two Fifth Circuit decisions, the Plaintiffs argue that such a situation exists where two offices were originally part of a single site but for logistical reasons, such as space considerations, they later separated.  *Id.* at 48.  The Plaintiffs contend that is the case here, where the Worley Manheim Office and the Amerigreen Lancaster Office were previously a single site which only separated because of space considerations as Amerigreen Energy grew in size.  *Id.* at 49.  The Plaintiffs assert that this was a truly unusual organizational situation for another reason: the two facilities "were simply two doors into the Company's criminal house of cards," based on "illusory" corporate distinctions between Worley and Amerigreen Energy.  *Id.*

With respect to geographic proximity, the Court finds that the Worley Manheim Office

and the Amerigreen Lancaster Office are in reasonable geographic proximity of each other.

Although what constitutes "reasonable" geographic proximity is going to vary from case to case,

here less than 10 miles and 15 minutes separate the facilities in neighboring towns in central

Pennsylvania.

The Court concludes, however, that material factual disputes preclude a determination

with respect to the other legal issues applicable to the single site of employment test.  With

respect to whether the employees were shared between locations, the Defendants argue that only

33 Amerigreen Energy employees "regularly" reported to the Amerigreen Lancaster Office.  The

term "regularly" leaves room for much interpretation, however, and the Court does not have

evidence as to how many of those employees also reported elsewhere, or how many Worley

employees may have regularly worked from the Amerigreen Lancaster Office.  Likewise, the

Plaintiffs assert that "numerous" Amerigreen Energy employees traveled to the Worley

Manheim office, while "numerous" Worley employees traveled to the Amerigreen Lancaster

office.  The Court does not have evidence to evaluate these claims of numerosity, however, and

in their brief the Plaintiffs identify only three employees from each of Worley and Amerigreen

Energy alleged to do so (two of which are Mr. Obetz and Mr. Hagaman, both of whom might be

expected to travel between locations).  A material factual dispute exists as to whether the Worley

and Amerigreen Energy facilities shared the same staff, as opposed to outlier senior management

members working from both locations, precluding summary judgment.

Likewise, the Court needs further factual development regarding whether the Worley

Manheim Office and the Amerigreen Lancaster Office were "used for the same purpose."  While

it appears clear there was overlap between the two entities' business purpose and operations, that

does not necessarily equate to their facilities being used for the same business purpose. In particular, it is possible that as Amerigreen Energy expanded and grew its customer base, its business purpose diverged from Worley's more so than it had initially, when Amerigreen was dependent on Worley for sales. There is a material factual dispute as to whether, at the time the WARN Act notice would have been required, Worley and Amerigreen Energy offered sufficiently distinct products and services, even if some overlap existed, for their separate facilities to have had the same business purpose. The Court requires further evidence on this point, and cannot rule as a matter of law at the summary judgment stage that the two facilities constituted a single site of employment.[14]

### G. Disputed Material Facts Preclude Partial Summary Judgment With Respect to Amerigreen Propane

The Defendants argue that Amerigreen Propane had no employees at the time the Defendants closed, and therefore is not an employer under the WARN Act and is entitled to summary judgment. Defendants' Summary Judgment Brief, at 16. The Plaintiffs respond that Amerigreen Propane directly employed three people, including Plaintiff Marco Perez, and cites as evidence a Worley Employee List listing three employees. Factual Dispute No. 22. The Court finds this issue is subject to a material factual dispute, precluding summary judgment in favor of the Defendants.

---

[14] The Court need not determine whether the two facilities can be deemed a single site of employment under the "truly unusual organization" test as argued by the Plaintiffs. The Defendants did not move for summary judgment on that issue, and while the Plaintiffs raise it in their response, they did not file a cross-motion for summary judgment on the issue. *See Sherwin Williams Co. v. Grasso (In re Grasso)*, 497 B.R. 434, 439 (Bankr. E.D. Pa. 2013) (arguments in summary judgment response brief that are unrelated to arguments presented in the summary judgment motion should be made pursuant to a cross motion for summary judgment) (*citing Merritt v. Medical Disability Ins. Plan*, 1998 U.S. Dist. LEXIS 23836, at *1 (D.N.J. Aug. 28, 1998)).

IV.    **CONCLUSION**

For the reasons discussed above, the Court will (a) grant the Plaintiffs' Summary

Judgment Motion, and (b) deny the Defendants' Summary Judgment Motion.  An Order

consistent with this Memorandum will be entered.

Dated:  October 12, 2022

MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

Robert E. Chernicoff, Esquire
Cunningham & Chernicoff
2320 North Second Street
P.O. Box 60457
Harrisburg, PA 17106-0457

Christopher D. Loizides, Esquire
Loizides & Associates
1225 King Street, Suite 800
Wilmington, DE 19801

Jack A. Raisner, Esquire
René S. Roupinian, Esquire
Raisner & Roupinian LLP
270 Madison Avenue, Suite 1801
New York, NY 10016

William J. Burnett, Esquire
Flaster/Greenberg, PC
1717 Arch Street, Suite 3300
Philadelphia, PA 19103

Jesse M. Harris, Esquire
Steven K. Ludwig, Esquire
Jason C. Manfrey, Esquire
Michael G. Menkowitz, Esquire
Fox Rothschild, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103